**PLANNED PARENTHOOD,**
et al., Plaintiffs

v.

Boykin ROSE, et al.   Defendants

No. 2–01–3571–23.

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 26, 2002.

Michael P. O'Connell, Stirling O'Connell and Pennington, Charleston, SC, Peter L. Murphy, Columbia, SC, Roger Evans, Carrie Y. Flaxman, New York, NY, for Plaintiff.

Treva G. Ashworth, John W. McIntosh, Kenneth Paul Woodington, Tracey Colton Green, SC Attorney General's Office, Columbia, SC, Charles Molony Condon, Office of Attorney General, Columbia, SC, for Defendants.

### *OPINION AND ORDER*

BERTELSMAN, Senior District Judge.[1]

This case arises out of a dispute regarding the constitutionality of a South Carolina statute authorizing the issuance of special motor vehicle license plates bearing the words "Choose Life."

Before the court are the parties' cross-motions for summary judgment. The court heard oral argument on these motions on November 22, 2002.

The matter having been taken under submission, the court now issues the following opinion addressing the merits of the controversy.

### *STATEMENT OF FACTS*

**A. The South Carolina "Choose Life" License Plate Statute.**

In 2001, the South Carolina General Assembly enacted Section 56–3–8910 of the Code of Laws of South Carolina ("the Act"). The Act requires the Department of Public Safety ("DPS") to issue special motor vehicle license plates with the words "Choose Life" to interested vehicle owners.[2]

The fee for a "Choose Life" plate is $70 every two years, in addition to the regular license fee. S.C. CODE ANN. § 56–3–8910(A) (Law. Co-op 2002). Proceeds

from the sale of the plates are to be deposited into a special account administered by the state Department of Social Services ("DSS"). S.C. CODE ANN. § 56–3–8910(B). Local private non-profit organizations that provide "crisis pregnancy" programs may apply for grants from this special fund. *Id.* However, grants may not be awarded to "any agency, institution, or organization that provides, promotes, or refers for abortion." *Id.*

The legislation that ultimately gave rise to the "Choose Life" special license plate statute was promoted in the South Carolina legislature by state Senator Michael L. Fair. (Affidavit of Michael Fair ¶¶ 4, 8) (attached to Doc. # 42) Fair championed the "Choose Life" license plate legislation on his own initiative; it was not the result of any formal petition by anyone seeking the issuance of such a plate. *Id.* ¶ 6.

**B. South Carolina's Alternative License Plate Program.**

A separate, and preexisting, South Carolina statute permits nonprofit organizations to apply for license plates promoting their group. *See* S.C. CODE ANN. § 56–3–8000. This organizational plate scheme differs in various respects from the "Choose Life" scheme. For example, while the "Choose Life" plates were created and "preapproved" by a special act of the state legislature, nonprofit organizations desiring a plate for their group must apply to the DPS. *Id.* Organizational applicants must submit proof of the group's nonprofit, tax-exempt status; 400 prepaid applications or a $4,000 deposit; camera-ready artwork; and a marketing plan for

---

**1.** Hon. William O. Bertelsman, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

**2.** The DPS must first receive 400 pre-paid applications for the special plate, or a deposit

of $4,000 from an interested individual or organization, before it may begin production and distribution of the plates. S.C. CODE ANN. § 56–3–8910(C).

the sale of the plate which must be approved by the DPS. *See* Form DMVB–21, "Application for Non–Profit Organization Plate," *available at* http://www.scdps.org/dmv/forms (last visited Dec. 18, 2002). Such plates may bear only the "emblem, seal or other symbol" of the organization that the Department of Public Safety "considers appropriate." S.C. CODE ANN. § 56–3–8000(A). The DPS may "alter, modify, or refuse to produce" any organizational plate that "it deems offensive or fails to meet community standards." S.C. CODE ANN. § 56–3–8000(H).

In addition, while "Choose Life" special license plates are available to any individual who owns a private passenger vehicle registered in South Carolina, organizational plates are available only to certified members of the non-profit organization. S.C. CODE ANN. § 56–3–8000(D).

Finally, Title 56 of the South Carolina Code authorizes literally dozens of other specialty vehicle license plates, some contingent upon organizational membership and some not. *See, e.g.,* S.C. CODE ANN. § 56–3–3310 (Purple Heart recipient plate); § 56–3–3410 (National Wild Turkey Federation); § 56–3–3710 (college and university plates); § 56–3–3950 ("Keep South Carolina Beautiful"); § 56–3–5200 ("First in Golf"); § 56–3–5350 (Normandy invasion survivor plate); § 56–3–7610 (Square and Round Dancers); § 56–3–7860 (Shriners); § 56–3–7910 (H.L.Hunley); § 56–3–8200 (Rotary International); § 56–3–8600 (Ducks Unlimited); § 56–3–8710 (NASCAR plates). This list is merely illustrative; the Code provides for other specialty plates.

### C. The Present Litigation.

Plaintiffs filed this action in September, 2001, in the United States District Court for the District of South Carolina at Charleston. (Doc. # 1)

Plaintiff Renee Carter owns an automobile registered in South Carolina. Carter would like to purchase a special plate for her automobile expressing her view that women should be permitted to choose whether to have an abortion.

Plaintiff Planned Parenthood owns a reproductive health organization that provides services to women in South Carolina. Planned Parenthood also provides first-trimester abortions at its clinics and refers patients for abortions at other facilities.

Defendants are the state officials charged with administering the "Choose Life" license plate program. B. Boykin Rose is the Director of the DPS of South Carolina, the agency charged with processing applications for the plates. Gary D. Maynard is the Director of the Department of Corrections of South Carolina, the department charged with producing the plates. Elizabeth G. Patterson is the Director of the DSS of South Carolina, the department charged with administering the special fund created by fees from sale of the "Choose Life" plates. All individual defendants are sued in their official capacities.

Plaintiffs allege that the Act suffers from a variety of constitutional infirmities: that it infringes the First Amendment by discriminating on the basis of viewpoint and by placing an unconstitutional condition on the exercise of their constitutional rights; that it violates the Fourteenth Amendment by placing an undue burden on Planned Parenthood's patients' rights to choose an abortion; and that it infringes plaintiffs' Fourteenth Amendment rights to equal protection and due process.

On November 20, 2001, United States District Judge Patrick Michael Duffy granted plaintiffs' motion for a preliminary injunction and temporarily enjoined enforcement of the Act. (Doc. # 30) Judge

Duffy indicated a willingness to consolidate the preliminary injunction proceeding with a decision on the merits, but defendants requested time for additional briefing. *Id.* at 4 n. 1.

Accordingly, the parties conducted limited discovery and filed the cross-motions for summary judgment that are now ripe for disposition.

After careful consideration, this court has concluded that the plaintiffs have standing to mount a facial challenge to the Act, and that the Act is void on its face because it violates well established First Amendment principles governing public fora and/or the issuance of permits to exercise free speech.

## ANALYSIS

### 1. What this case is not about.

This is a free speech case. It is not about the merits of the ongoing national controversy between the pro-life and pro-choice movements. In another case, in some other court, the position of the parties with regard to some other state's issuance of a license plate could well be reversed.

### 2. Standing.

■ The court must first address the issue of standing, because this issue goes to the jurisdiction of the court. If a plaintiff does not have standing, the matter before the court is not a "case or controversy," as required by Article III of the Constitution of the United States for subject matter jurisdiction to exist. *Finlator v. Powers,* 902 F.2d 1158, 1160 (4th Cir. 1990).

Defendants cite *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), in support of their argument that plaintiffs lack standing to assert their First Amendment claims.[3] There, the Supreme Court lists the following three requisites for standing:

1. First, the plaintiff must have suffered an "injury in fact"— an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent.[4]

2. Second, there must be a causal connection between the injury and the conduct complained of, i.e., the injury has to be fairly traceable to the challenged action of the defendant.

3. Third, it must be likely that the injury will be redressed by a decision favorable to the plaintiffs.

504 U.S. at 560–61, 112 S.Ct at 2136. "In the shorthand analysis of standing, these three basic requirements are referred to as injury-in-fact, causation and redressability." *Finlator,* 902 F.2d at 1160.

■ Here, the defendants particularly contend that the third element is lacking. Defendants point out that a decision finding the "Choose Life" statute unconstitutional will not result in the issuance of a license plate expressing a slogan of plaintiffs' choice. Defendants also argue that the case is not "ripe" in that the plaintiffs have not petitioned the legislature for issuance of a plate of their choice.

It appears that the only appellate decision addressing standing in the context of a license plate is *Henderson v. Stalder,* 287 F.3d 374 (5th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 602, —— L.Ed.2d ——

---

**3.** Because the court finds the resolution of plaintiffs' first cause of action dispositive of the pending motions, it need not reach the merits of their other claims.

**4.** Here, the plaintiffs allege they have been denied the ability to have a license plate bearing a symbol or slogan of their choice.

(2002), which adopted these arguments with one judge forcefully dissenting.

Judge Davis's dissent relies first on a firmly established exception to the general rules of standing where First Amendment rights are at issue. In such cases, an expanded rule of standing must be used, especially where the actual or possible exercise of unbridled discretion by public officials is at issue. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988). The teaching of *Lakewood* has been summarized as follows:

> If a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license. *A facial challenge lies whenever a licensing law gives to a government official or agency substantial power to discriminate based on the context or viewpoint of speech by suppressing disfavored speech or disliked speakers.*

15 *Moore's Federal Practice* § 101.61[5][b](ii) (3d ed.2002), (emphasis added) (citing *Lakewood, supra* ).

Judge Davis's dissent also relies on another line of Supreme Court cases addressing the "redressability" requirement. In those cases, the Court holds that a person or group excluded from benefits conveyed via an underinclusive statute has standing to challenge the statute on constitutional grounds, even if the effect of striking down the statute is to deny the benefit to the intended group and not extend it to the plaintiffs. *See Texas Monthly, Inc. v.*

*Bullock,* 489 U.S. 1, 7–8, 109 S.Ct. 890, 895, 103 L.Ed.2d 1 (1989); *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 227, 107 S.Ct. 1722, 1726–27, 95 L.Ed.2d 209 (1987); *Orr v. Orr,* 440 U.S. 268, 271–73, 99 S.Ct. 1102, 1107–09, 59 L.Ed.2d 306 (1979).

As did the judges of the Fifth Circuit, other courts have disagreed with each other on whether or not a plaintiff has standing to challenge a statute authorizing the issuance of a license plate bearing a slogan or logo that is objectionable to a plaintiff.[5]

After careful consideration, this court concludes that standing does exist under the doctrines discussed above whereby enhanced standing is afforded to plaintiffs making facial First Amendment challenges to licensing or underinclusive statutes.

In this regard, the Supreme Court's opinion in *City of Lakewood v. Plain Dealer Publ'g Co., supra,* is noteworthy. In *Lakewood,* the publisher of a newspaper challenged an ordinance which gave the mayor of a city nearly total discretion in granting or denying permits for locating news racks on public property.

Upholding the newspaper's standing to make a facial challenge to the ordinance, the Court observed:

> In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, *whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license.*

486 U.S. at 756, 108 S.Ct. 2138 (emphasis in original) (quoting *Freedman v. Mary-*

---

**5.** Recognizing standing: *Henderson v. Stalder,* 112 F.Supp.2d 589 (D.La.2000), *rev'd,* 287 F.3d 374 (5th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 602, —— L.Ed.2d——, 71 U.S.L.W. 3283 (U.S. Dec. 2, 2002); denying

standing: *Hildreth v. Dickinson,* No. 99–583–CIV–J–21–A, 1999 U.S. Dist. LEXIS (M.D.Fla. Dec. 22, 1999); *Women's Emergency Network v. Dickinson,* 214 F.Supp.2d 1308 (S.D.Fla. 2002).

*land,* 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1985)).

Pursuant to the above authorities, this court respectfully disagrees with the Fifth Circuit majority in *Henderson v. Stalder, supra.*

Moreover, the Supreme Court's reasoning in those cases has been applied by the Fourth Circuit, whose decisions are binding on this court. *See Chesapeake B & M, Inc. v. Hartford County, MD,* 58 F.3d 1005, 1009–10 (4 th Cir.) (applying *Lakewood* to find that plaintiffs had standing to make facial First Amendment challenge to licensing law), *cert. denied,* 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 492 (1995); *Finlator v. Powers,* 902 F.2d 1158, 1161–62 (4th Cir.1990).

In *Finlator,* the Fourth Circuit held that book purchasers and sellers had standing to challenge the constitutionality of a North Carolina statute exempting from state tax the proceeds from the sale of Bibles. The state argued that because the plaintiffs had not taken any steps to "ensure" their standing—such as contesting the tax prior to its payment, refusing to pay the tax, paying the tax under protest, seeking a refund, or taking some other action to permit the state to preclude or redress their injuries—they could not show any particularized injury caused by the defendant. The Fourth Circuit rejected this argument, with reasoning that bears quoting at length:

> While there is some justification for the Secretary's interpretation of *Arkansas Writers' Project* and *Texas Monthly,* we decline to read such an implicit requirement into these decisions absent a clear statement by the Supreme Court to that effect. *Realistically, if this court were to deny standing in this case, the appellants would simply protest the payment and collection of the State's sales tax, and refile their suit. We do not believe that this additional requirement would improve the vigorousness or quality of the parties' advocacy, would enhance the posture of this case, would strengthen the justiciability of the appellants' claims, or would contribute in any way to our ability to decide a question presented and contested by parties having a demonstrated interest and stake in its resolution. Moreover, we conclude that the appellants did suffer actual injury in this case as a result of the discriminatory treatment dispensed by the Secretary—purchasers of "Holy Bibles" need not protest the State's sales tax in order to claim the Exemption, while purchasers of other texts, both sacred and non-sacred, must protest the sales tax in order to claim the Exemption....* Finally, we believe that it would be an untenable waste of judicial resources to deny the appellants standing in this case given the patent unconstitutionality of the Exemption. As noted above, standing is an amalgam of prudential as well as constitutional concerns, but none of the prudential concerns of standing compels the denial of standing in this case.

*Id.* at 1162 (emphasis added).

Moreover, in the opinion of this court, the Fifth Circuit's view in *Henderson, supra,* does not give sufficient weight to the principle that it is the *threat* of having one's sacred First Amendment rights subjected to arbitrary censorship that constitutes the injury that is the basis of standing in this context:

> The District Court's finding that in this instance the Forsyth County administrator applied legitimate, content-neutral criteria, even if correct, is irrelevant to this facial challenge. Facial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision.

See *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 770, 108 S.Ct. 2138, 2151, 100 L.Ed.2d 771 (1988). *"It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940). Accordingly, the success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so. *Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 133 n. 10, 112 S.Ct. 2395, 2403 n. 10, 120 L.Ed.2d 101 (1992) (emphasis added).

Further,

Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas.... The cases ... indicate that the rule [allowing standing for a facial challenge] is *not based on any assumption that application for the license would be refused* .... Rather it derives from an appreciation of the character of the evil inherent in a licensing system.

*Thornhill v. Alabama,* 310 U.S. at 97, 60 S.Ct. at 741–42 (citations omitted).

Stated differently, "the plaintiffs are injured by the government's promotion of one side of the debate on the abortion rights issue in a speech forum, coupled with the lack of opportunity to present their opposing view." *Henderson,* 287 F.3d at 387 (Davis, J. dissenting).

In the case now before this court, it is the legislature that has authorized the issuance of a "Choose Life" license plate.

This decision, by the nature of the legislative process, was based on the discretion of the legislators, uncontrolled by any standards. Equally significant, the plaintiffs allege that the legislature has selected one viewpoint over all others on a particular topic, permitting it alone expression in a public forum.

Therefore, pursuant to the authorities discussed above, the plaintiffs here have standing to mount a facial challenge to the statute without having applied for the issuance of a license plate bearing a slogan of their own choice.

### 3. The Merits.

### A. Government versus private speech.

■ The first step in analyzing the merits of plaintiffs' First Amendment claims is to determine whether the speech implicated by the "Choose Life" license plates is "government" or "private" speech. *Sons of Confederate Veterans, Inc. v. Commissioner Of The Virginia Department Of Motor Vehicles,* 288 F.3d 610, 616–17 (4th Cir.2002) (hereafter "*SCV*").

Defendants argue that the "Choose Life" license plate embodies government speech, rather than private speech. Under this theory the government, of course, would be free to express its own viewpoint on most issues without providing for the expression of contrary views. *Id.*

However, defendants' argument is directly contrary to the recent decision of the United States Court of Appeals for the Fourth Circuit in *SCV.*

In *SCV,* the Fourth Circuit considered a constitutional challenge to a Virginia statute that prohibited display of the logo of the Sons of Confederate Veterans on its specialty organization license plate. The state argued that any expressive content on the plate was a "statement" by the state of Virginia, not private speech by the

organization's members. After setting forth and examining several factors it deemed relevant, the Fourth Circuit concluded that the specialty license plates embodied private, not government, speech. *Id.* at 621.

Therefore, this court must analyze the validity of the statute challenged here under those First Amendment principles applicable to private rather than governmental expression.

### B. Forum analysis.

▇▇▇ As private expression, plaintiffs' claims may be analyzed on the merits either under First Amendment principles governing licensing or those concerned with access to public fora. Whichever doctrine is invoked, clearly established precedents require that plaintiffs prevail.

Forum analysis examines restrictions placed on private speech that occurs on government property or with government participation. *SCV,* 288 F.3d at 622. The three fora recognized are: (1) traditional public fora, such as streets, parks, and sidewalk; (2) designated public fora; and (3) nonpublic fora. *Id.* at 623 n. 10 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). The latter two types of fora are created when the government grants access to property or resources to private speakers. *Id.*

▇▇▇ While the government's ability to regulate private speech depends in part on the type of forum involved, viewpoint discrimination is presumed impermissible in any forum under any analysis. *Id.* at 622 (citing *Rosenberger v. Rector and Visitors of University of Virginia,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). Thus, the type of forum that exists is relevant only if the restriction is viewpoint neutral. *Id.* at 623.

Defendants do not contend that the "Choose Life" phrase is viewpoint neutral. Indeed, they affirmatively state that the "Choose Life" license plate "is the most recent and apparently most visible manifestation of the State's clear and oft-repeated preference for childbirth over abortion." (Cross–Motion for Summary Judgment at 17) (Doc. # 42) *See also Hildreth v. Dickinson* No. 99–583–CIV–J–21–A, 1999 U.S. Dist. LEXIS 22503, at *7 (M.D.Fla. Dec. 22, 1999) (" 'Choose Life' is a slogan which is generally associated with a social, religious, or political view which espouses the sanctity of human life and encourages adoption in lieu of abortion.").

In *SCV, supra,* the Fourth Circuit employed forum analysis in the scrutiny of a special license plate. There, a statute granted members of the Sons of Confederate Veterans organization the right to have issued to them a special license plate. The statute specifically provided, however, that no "logo or emblem of any description shall be displayed or incorporated into the design of license plates issued under this section." 288 F.3d at 613. Apparently, the legislature wished to prevent the inclusion of a Confederate flag on the special plate. *Id.* at 623.

The court observed that the General Assembly of Virginia had "created a program through which 'special' Virginia license plates may be issued to members and supporters of various organizations or groups." *Id.* at 614. Numerous special license plates had been authorized at the behest of various groups and organizations pursuant to such statutes. Only the Sons of Confederate Veterans had been forbidden to have their logo on their special plate, however.

The court held that the special license plate program in effect created a public forum and that the prohibition of a logo to

one organization accessing that forum was viewpoint discrimination. *Id.* at 626–27. The court reasoned:

> In the realm of private speech or expression, government regulation may not favor one speaker over another. Similarly, "[t]he government must abstain from regulating speech when the motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Thus, where an evaluation of a given restriction and the surrounding circumstances indicates that one or more speakers are favored over others, and further that the basis for the restriction is in fact the message the disfavored speaker seeks to convey, the restriction violates the First Amendment. Moreover, where restrictions or regulations of speech discriminate on the basis of the content of speech, there is an "inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion ..."-in other words, to exercise viewpoint discrimination.

*Id.* at 624 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (citation omitted) and *Turner Broadcasting Sys., Inc. v. F.C.C.,* 512 U.S. 622, 642–43, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

On the basis of these clear and well-established principles, this court must conclude that the statute at issue here is a clear manifestation of viewpoint discrimination. "Choose Life" is preferred over whatever motto or slogan the plaintiffs

might employ to promote their point of view.

Therefore, because defendants have failed to articulate any compelling government interest for the statute at issue, or to otherwise rebut the presumption of unconstitutionality that attaches to such viewpoint discrimination, plaintiffs are entitled to summary judgment on their claim that the statute violates the First Amendment under a public forum analysis. *Id.* at 626, 114 S.Ct. 2445.

### C. Licensing Analysis.

A licensing analysis is closely tied to the public forum analysis in part B by the First Amendment's abhorrence of the exercise of viewpoint discrimination in the regulation of private speech by government officials.[6] In the licensing context, the threat of such discrimination arises from the lack of standards, opening the door to the exercise of uncontrolled discretion. In the forum context, viewpoint discrimination can result from the application of standards which prefer one viewpoint over another.

■ The same licensing case precedents which gave the plaintiffs enhanced First Amendment standing also require this court to hold that the Act is void on its face. Fewer principles are better established in First Amendment law than the principle that exercise of the right of free speech may not be subjected to the unlimited discretion of public officials:

> *[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship. E.g., Shut-*

---

6. A recent opinion of the Seventh Circuit contains a thoughtful discussion of the relationship between the "unbridled discretion" standard enunciated by the Supreme Court in the licensing context and the First Amendment's

"viewpoint neutrality" mandate generally encountered in the public forum context. *See Southworth v. Board of Regents of the University of Wisconsin System,* 307 F.3d 566, 575–80 (7th Cir.2002).

*tlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Staub v. City of Baxley,* 355 U.S. 313, 321–22, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) .... [T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused....

As we said in *Thornhill:* ... "The power of the licensor ... is pernicious not merely by reason of the censure of particular comments but by the reason of the *threat to censure comments on matters of public concern.*"

*City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. at 757, 108 S.Ct. at 2144 (emphasis added in part) (quoting *Thornhill v. State of Alabama,* 310 U.S. at 97, 60 S.Ct. at 741–42).

Thus, in a recent articulation of the doctrine based on the above free speech principles, the Supreme Court held:

[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth,* 394 U.S. at 150–51, 89 S.Ct. at 938; see also *Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951). The reasoning is simple: If the permit scheme "involves appraisal of facts, the exercise of judg-

ment, and the formation of an opinion" by the licensing authority, "the danger of censorship and of abridgement of our precious First Amendment freedoms is too great" to be permitted.

*Forsyth County v. Nationalist Movement,* 505 U.S. at 134, 112 S.Ct. at 2401–02 (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 305, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940) and *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975)).

Many other cases and authorities support this fundamental principle.[7]

Pursuant to these authorities, this court must conclude that the statute before it is void. The "Choose Life" license plate was issued pursuant to the uncontrolled discretion of ·the legislature, which was free to, and undoubtedly did, approve a license plate with a slogan popular with its constituents. Indeed, this is the nature of the legislative process. Defendants here make no argument that the fact that it is the legislature, rather than a state official, that has exercised the standardless discretion to issue the plate lends that exercise legitimacy.

Nor could they. In *SCV,* the license plate logo restriction was held void in part because of viewpoint discrimination by the legislature itself. 288 F.3d at 626. *See also* Leslie Gielow Jacobs, *Free Speech and the Limits of Legislative Discretion: The Example of Specialty License Plates,* 53 FLA. L. REV. 419, 472 (2001).

---

7. *See Thomas v. Chicago Park Dist.,* 534 U.S. 316, 323, 122 S.Ct. 775, 780, 151 L.Ed.2d 783 (2002); *11126 Baltimore Blvd., Inc. v. Prince George's County, Md.,* 58 F.3d 988, 994 (4th Cir.), *cert. denied,* 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 492 (1995); *Chesapeake B & M, Inc. v. Harford County, MD,* 58 F.3d 1005, 1009–10 (4th Cir.), *cert. denied,* 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 492 (1995); CHESTER JAMES ANTEAU, MODERN CONSTITUTIONAL LAW, § 3.07 (1997); 4 RONALD D. ROTUNDA & JOHN E. NOVAK, TREATISE ON CONSTITUTIONAL LAW, SUBSTANCE AND PROCEDURE, § 20.46 (3d ed.1999); *cf. Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (vagueness doctrine).

AsSCV *SCV,* violation of First Amendment principles by the legislature renders the statute void.

## CONCLUSION

This decision does not deny Right to Life advocates the opportunity to have their own South Carolina license plate. They need only use the alternate licensing program, which vests the decision to issue a desired specialty plate in an administrative official acting pursuant to specified standards. That program appears, at least on its face, to be viewpoint neutral.[8] Plaintiffs or others who agree with them may utilize that scheme as well.

There are inherent problems with the state legislature issuing special plates on an *ad hoc* basis. As one commentator has observed:

> The current legislatively-run specialty plate programs mix two constitutionally inconsistent commands. The first is for legislators to enact laws that reflect the majority interests and values. The second is for them to administer a private speech forum in a way that does not discriminate according to viewpoint. The conflicting mandates render it almost certain that the administration of a private speech forum by the legislature will result in viewpoint discrimination. The legislature's broad discretion to enact or fail to enact laws based upon its perception of the public interest make it almost impossible for courts to determine if the constitutionally prohibited viewpoint discrimination has occurred. These observations lead to the conclusion that a legislature cannot constitutionally run a private speech forum. Of course states can choose to make specialty license plates available to their

citizens. To do so, however, they must remove administration of the program from the legislature. With clear, non-viewpoint discriminatory standards, administered consistently by an entity subject to meaningful judicial review, a specialty license plate program can meet the Constitution's free speech guarantee.

Jacobs, *supra,* at 473.

## ORDER

Therefore, for the reasons stated herein, it is hereby **ORDERED** as follows:

(1) that defendants' motion for summary judgment (Doc. # 43) be, and is hereby, **DENIED;**

(2) that plaintiffs' motion for summary judgment (Doc. # 36) be, and is hereby, **GRANTED;** and

(3) that Section 56–3–8910 of the Code of Laws of South Carolina be, and is hereby, declared unconstitutional under the Constitution of the United States of America for reasons stated in this opinion.

A separate judgment shall enter in plaintiffs' favor.

## JUDGMENT

Pursuant to the Opinion and Order entered concurrently herewith, and the court being advised,

**IT IS ORDERED AND ADJUDGED AS FOLLOWS:**

(1) That Section 56–3–8910 of the Code of Laws of South Carolina be, and is hereby, **declared to be in violation of the Constitution of the United States of America** and 42 U.S.C. § 1983;

---

8. This alternate statute is not before the court and no ruling is made thereon. Nor does this court express any view on the funding issue presented by the Act, which the court need not review.

(2) That defendants B. Boykin Rose, Gary D. Maynard, Elizabeth G. Patterson, and their officers, agents, servants, employees and attorneys be, and are hereby, **permanently enjoined** from all activities related to the enforcement of Section 56–3–8910 of the Code of Laws of South Carolina, including, but not limited to, taking applications or deposit monies for the "Choose Life" specialty plates, manufacturing the plates, or issuing the plates; and

(3) That this matter be, and is hereby, **dismissed and stricken** from the docket of this court, at the cost of the defendants.