Russell J. HENDERSON, et al.

v.

Richard L. STALDER, et al.

No. Civ.A. 00–2237.

United States District Court, E.D. Louisiana.

July 8, 2003.

Simon Heller, Brigitte Amiri, Center for Reproductive Law & Policy, New York City, William E. Rittenberg, Rittenberg & Samuel, LLC, New Orleans, LA, for Plaintiffs.

Thomas Scherer Halligan, Louisiana Department of Justice, Baton Rouge, LA, Roy A. Mongrue, Jr., Louisiana Department of Justice, Civil Division, Baton Rouge, LA, Stephen Alexaander Quidd, Louisiana Department of Public Safety & Corrections, Baton Rouge, LA, for Defendants.

Stephen M. Crampton, American Family Association Center for Law & Policy, Tupelo, MS, for Dorinda C. Bordlee.

Deana Palmisano Lejarza, Sessions, Fishman & Nathan, LLP, New Orleans, LA, Heidi K. Abegg, Webster, Chamberlain & Bean, Washington, DC, for Leonise Ditoro.

### ORDER AND REASONS

DUVAL, District Judge.

Before the Court is a Motion to Dismiss filed by defendants Richard L. Stalder, Secretary of the Louisiana Department of Public Safety and Corrections ("Stalder"), and John N. Kennedy ("Kennedy"), Treasurer of Louisiana. (Doc. No. 59) and a Motion for Partial Summary Judgment (Doc. 60) filed by plaintiffs Russell J. Henderson ("Henderson"), Doreen Keeler ("Keeler"), Robert H. Loewy ("Loewy"), Greater New Orleans Section of the National Council of Jewish Women ("NCJW"), Planned Parenthood of Louisiana ("Planned Parenthood") and Eugene LaMothe ("LaMothe"). The Court held oral argument on these motions on June 25, 2003. Having reviewed the pleadings, memorandum, and the relevant law, the Court finds as follows.

At the outset, the Court would note that this case is not about abortion, the right to

life or the right to choice; it is about the First Amendment and the constitutional guarantees that have been the bedrock of this great nation. To gloss over this most basic right of citizens of the United States is to invite a ride on the slippery slope to losing those rights.

## I. Procedural and Factual Background

This case was initially filed on July 31, 2000 by Henderson and Keeler. Loewy and NCJW were added as plaintiffs in an Amended Complaint on August 7, 2000. Plaintiffs challenged the constitutionality of La.Rev.Stat. 47:463.61 (the "Act") which creates a "Choose Life" prestige Louisiana license plate and a "Choose Life" fund within the state treasury.[1]

### A. The Act

The Act provides that special "prestige" license plates bearing the legend "Choose Life" shall be established by the Department of Public Safety and Corrections ("the Department") provided there are a minimum of one hundred applicants for such plates. The annual fee for such a plate is $25.00, in addition to the regular motor vehicle license fee plus a $3.50 handling fee "to be retained by the department to offset a portion of the administrative costs."

Under the Act's provisions, the revenue generated by the $25.00 surcharge is deposited into the state treasury to be distributed by the State Treasurer upon the recommendation by a "Choose Life" Advisory Council ("the Council"). These distributions must go to organizations established under section 501(c)(3) of the 1954 Internal Revenue Code and which organizations counsel women to place their children up for adoption. The Council is to select the color and design of the plate, is to review grant applications and is to make recommendations about the awarding of the grants. However, the decision with respect to the actual distribution of funds is ultimately to be made by the State Treasurer.

The Council is to be comprised of the president or designee of the American Family Association, the Louisiana Family Forum and the Concerned Women of America organizations. The Council at its discretion may also add members from other specified secular groups.[2] Members of the Council serve for one-year terms, on a voluntary basis. No money is to be distributed to any organization that is involved in or associated with abortion clinics or pro-abortion advertising. Fifty percent of the funds is to be used for the material needs of the expectant mothers considering adoption and the remaining

1. The Act states specifically as its purpose:

 To enact R.S. 47:463.57, relative to motor vehicles; to provide relative to license plates; to create the "CHOOSE LIFE" prestige license plate; to provide for the issuance of such plate; to provide for a minimum number of applicants; to provide for the design and color of such plate; to provide relative to the fees for such plates; to provide for the creation of the "Choose Life" fund within the state treasury; to provide for the deposit of certain monies into the fund; to provide for the use of such monies; to provide for the qualifications of organizations applying for receipt to such

 monies; to require annual audit; to create the Choose Life Advisory Council; to provide for membership, terms, duties and pay for members of such Council; to authorize promulgation of rules and regulations; and to provide for related matters.
 It should be noted that Act was re-numbered upon codification.

2. Seven groups are delineated; physicians specializing in obstetrics; physicians specializing in pediatrics; women who have surrendered children for adoption; couples who have adopted children; adoption advocacy groups; board-certified social workers; and certified counselors.

moneys may be used for counseling, training, and providing pregnancy testing but is not to be used for administrative, legal or capital expenditures.

## B. Plaintiffs' Initial Contentions

Plaintiffs initially contended in their Complaint and First Amended Complaint that the Act delegates government functions to Christian fundamentalist organizations, that taxpayer money will be used to administer the Act, that no prestige license plate is available for "pro-choice" citizens and that the statute harms the plaintiffs' religious freedom as the Act places the State's imprimatur on fundamentalist Christian beliefs and advances those beliefs by creating a symbolic union between Christian fundamentalism and the State of Louisiana. As such, plaintiffs argued that a preliminary injunction should be issued to prohibit the defendants, Stalder and Kennedy from "enforcing or implementing Louisiana House Bill No.2082, codified at La.Rev.Stat. § 47:463.61 (1999)" and specifically directing them to halt production of the "Choose Life" special prestige license plates.

Thus, they sought a preliminary injunction reasoning that (1) the Act's delegation of a governmental function to Christian fundamentalist organizations violated the Establishment Clause of the First Amendment and (2) in the absence of an injunction, the State of Louisiana (the "State") would be actively engaging in viewpoint discrimination by allowing a pro-life viewpoint to be expressed through license plates, but not a pro-choice view in contravention of the First Amendment right to free speech.

## C. This Court's First Ruling

A Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction was filed by plaintiffs on August 7, 2000. The Court denied the TRO on December 8, 2000, and set the preliminary injunction for hearing on August 23, 2000. On August 29, 2000, this Court granted the motion for preliminary injunction and enjoined defendants from enforcing or implementing the Act. In doing so, this Court rejected the defendants argument that the "Choose life" license plate constituted an expression of "state speech" and therefore did not create a forum for private speech.[3] Rather, the Court found that the state had created a private forum under the license plate scheme. As such, assuming that the prestige license plates constituted a non-public forum, this Court found that the defendants had to maintain view-point neutrality with regard to the messages displayed. As the State took the position unequivocally that "Choose Life" was its own private message, this Court found that "the State fails in its responsibility to provide a viewpoint-neutral forum, and the Act will probably be found to be an unconstitutional violation of the First Amendment right to free speech." *Henderson v. Stalder,* 112 F.Supp.2d 589, 599 (E.D.La.2000).

A Notice of Appeal was filed on September 26, 2000, from the injunction while the matter remained open on this Court's docket. On October 20, 2000, plaintiffs sought a stay of the preliminary injunction. While that was pending, a Second Amended Complaint was filed adding Planned Parenthood and LaMothe. The Motion for Stay was denied by this Court on December 22, 2000. On January 17, 2001, the

---

**3.** The Court also found that there was no substantial likelihood of success on plaintiffs' Establishment Clause claim because there was insufficient evidence of an excessive entanglement sufficient to render the Act unconstitutional. *Henderson,* 112 F.Supp.2d at 595.

initial appeal by defendants was dismissed for want of prosecution.

Delays in the prosecution of the case occurred because of the possibility of a legislative resolution to the dispute; however, no resolution was ever reached. On May 16, 2001, the Court of Appeals granted the defendant's Motion to Reinstate Their Appeal. Nonetheless, the matter was open on the Court's docket and eventually set for trial. Some discovery was conducted, and trial was then set for July 18, 2002. The matter was eventually stayed on April 30, 2002, pending the appeal.

### D. The Appeal

While the issue of standing was not raised by the parties before this Court, the United States Court of Appeals for the Fifth Circuit raised the issue *sua sponte* with respect to each of the plaintiffs, including those who were not before this Court when the preliminary injunction was granted. *Henderson v. Stalder*, 287 F.3d 374, 379 (5th Cir.2002). The appellate court analyzed three distinct categories for purposes of standing—(1) taxpayer, (2) individual, and (3) organizational.

It first addressed "taxpayer standing" as alleged by Henderson, Keeler, Loewy and LaMothe. With regard to any allegation of injury based on the use of their tax money to make and distribute the Choose Life license plate, the appellate court held that these plaintiffs lacked a sufficient personal stake to challenge this law of general applicability since they could not show a direct pecuniary injury as a result of its enforcement. *Id.*

With respect to the taxpayer claim based on the administration of the statute including the establishment and maintenance of the Choose Life Council and Fund, the Fifth Circuit analyzed the standing of the taxpayers with regard to the use of tax dollars to administer a statute which

violates the Establishment Clause. It found that under the language of funding scheme of the statute, the allegations that tax dollars were to be used was insupportable because of the various fees imbedded in the statute, and thus no standing was found under this theory. *Henderson*, 287 F.3d at 380.

The appellate court also examined with respect to taxpayer's standing, Loewy, LaMothe and the NCJW's allegations that the state harmed their religious beliefs and/ or principles and endorsed Christian fundamentalism in contravention of the Establishment Clause, because the mandatory members of the Choose Life Council belong to organizations which allegedly espouse a belief in Christianity. The appellate court found no standing with respect to those claims because of the "conjectural" nature of these allegations. The Fifth Circuit stated in that regard:

> There is, however, no allegation that the mandatory members of the Council have yet distributed any money from the Choose Life Fund or that in so doing, or contemplating distributions, they have actually advanced the religious ideologies of their respective organizations or religion in general. At best, the focus of the alleged injury complained of by these plaintiffs arises because of an appearance of future impropriety which we have found insufficient to confer standing. [*Public Citizen, Inc. v.*] *Bomer*, [274 F.3d 212,] at 218 (5th Cir.2002).

*Id.* Thus, the appellate court found that Loewy, LaMothe and NCJW in their allegations concerning the manner in which the Choose Life statute would be administered, failed to allege an "injury in fact" and thus lacked standing to challenge the facial constitutionality of that statute. In a footnote, the Fifth Circuit noted that the unavailability of a facial challenge did not imply that an as-applied challenge at a

future date after implementation of the statute would be foreclosed.

The Fifth Circuit then examined whether Keeler as an individual had standing based on her alleged injury based on there being no similar "Pro–Choice" prestige plate. The Fifth Circuit relying on *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), found that for there to be standing Keeler had to show that the injury about which she complained will "likely be redressed by a favorable decision of the Court." Since declaring the statute unconstitutional would not provide Keeler with a forum, rather it would simply prevent others from expressing their view, the Fifth Circuit found that the injury could not redressed by a declaration that the Choose Life statute is unconstitutional.[4]

The Fifth Circuit then addressed "organizational standing"-that is the standing of Planned Parenthood. The appellate court stated:

> The injury complained of by [Planned Parenthood] arises from its alleged exclusion from eligibility to receive grants from the Choose Life Fund because it engages in abortion-related activities. The relief requested by [Planned Parenthood] arises from its alleged exclusion from eligibility to receive grants from the Choose Life Fund because it engages in abortion-related activities. The relief requested by [Planned Parenthood] in federal court is a declaratory judgment that [the Act] is unconstitutional. We find that even if the Choose Life statute is declared unconstitutional, the injury complained of by [Planned Parenthood] would not be redressed because there would then be no fund from which [Planned Parenthood] could seek grants.

*Henderson*, 287 F.3d at 382. Thus, based on the lack of redressability, the appellate court found the Planned Parenthood had not established that its standing to challenge the statute.

Having found that not one plaintiff had established standing, the Fifth Circuit reversed, vacated and remanded the case to this Court for an entry of dismissal.

### E. Procedural Activity Post–Appeal

On April 12, 2002, plaintiffs moved for Rehearing en Banc. On August 9, 2002, the petition was denied. Plaintiffs sought to stay the mandate pending petition for writ of certiorari to the Untied States Supreme Court, which was denied on September 24, 2002. Mandate issued and this court dismissed the suit as instructed. The Supreme Court denied the petition for certiorari on December 10, 2002.

On January 9, 2003, the Fifth Circuit then issued the following order:

> The court's previous order, entered September 24, 2002, denying appellees' motion to stay the mandate pending petition for writ of certiorari, is hereby VACATED; the mandate issued herein is RECALLED; the court VACATES its order of August 9, 2002 denying appellees' petition for rehearing en banc, and substitutes the following response to appellees' motion for rehearing en banc:
>
> The petition for rehearing en banc is DENIED. The case is remanded to the district court with instructions to dismiss the case for lack of standing unless the plaintiff Keeler amends her petition within a reasonable time to challenge the state's overall policy and practice of issuing specialty license plates. Judge

---

**4.** In her special concurrence, Judge Jones noted that a way to overcome this infirmity was for Keeler to challenge the entire scheme to bring her within the holding of *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979). *Henderson*, 287 F.3d at 386.

Davis would grant rehearing for reasons stated in his dissent.

(Doc. 54). Following the Fifth Circuit's instructions, the previous judgment dismissing this case was vacated and plaintiff Keller was given until March 7, 2003 to amend the petition to challenge the state's overall policy and practice of issuing specialty license plates.

### F. The Third Amended Complaint and the Instant Motions

On March 6, 2003, the Third Amended Petition was filed. In it, Henderson, Keeler, Loewy, NCJW, Planned Parenthood and LaMothe appear as plaintiffs and an attempt is made by them to allege standing as to each. In addition, plaintiffs contend that Third Amended Complaint amends the prior complaint in several important respects:

(1) the Third Amended Complaint explicitly raises a First Amendment challenge to the entire overall policy and practice under which Louisiana makes available certain specially designed license plates for the expression of certain views by Louisiana vehicle owners, and seek declaratory and injunctive relief against this entire policy and practice;

(2) the Third Amended complaint specifies that, if an injunction against the entire statutory scheme is not granted, alternatively Planned Parenthood requests that the Court enjoin the defendants from enforcing or implementing the last sentence of La.Rev. Stat. § 47:463.61(F)(2), which bars Planned parenthood from receiving Choose Life grants because it is an "organization involved in, or associated with counseling for, or referrals to, abortion clinics, providing medical abortion-related procedures, or

pro-abortion advertising: ('the disqualification clause'), and sever that sentence from the remainder of the statute"; and

(3) the Third Amended Complaint adds a new claim for Planned Parenthood, to wit, that the participation of the Choose Life Council in grant-making decisions under La. Rev. stat. § 47:463:61 violates the Establishment Clause.

(Doc. 60, Plaintiffs' Memorandum of Law, p. 2–3).

In response, defendants filed the instant Motion to Dismiss. They claim that the amended complaint fails to state a claim and should be dismissed because:

1. using principles of *res judicata,* law-of-the-case, and/or the rule of mandate, all of the claims of all of the plaintiffs were dismissed save for Keeler's and thus the Court may not entertain the other claims.

2. Planned Parenthood's claims should be dismissed "because they are virtually identical to *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233, (1991) and similar cases." [5]

3. That the footnote alluding to the possibility of an as-applied challenge in light of the "unavailability" of a "facial challenge" with respect to the Establishment Clause claims, did not authorize the re-urging of the dismissed claims as an "as-applied challenge" at this time.

4. As to Keeler's claim, that even as reconstituted as challenging the entire licensing scheme, the claim fails because the license plate constitutes Government speech which is not

**5.** The Supreme Court in *Rust* basically held that viewpoint-discriminatory conditions on

government subsidies does not violate First Amendment free speech rights.

subject to First Amendment application by a federal court.

In addition, they contend that the Court lacks jurisdiction and thus should dismiss the amended complaint because:

1. all plaintiffs except Keeler lack standing as outlined by the 5th Circuit.
2. Planned Parenthood claims raise no federal question jurisdiction because they have been rejected by *Rust*.
3. Any new claims made by plaintiffs to come within the "as-applied" caveat of footnote 6, are still hypothetical and no allegation of facts as to actual occurrences to prove actual constitutional injury are alleged and thus lack standing.

(Doc. 59).

In response, defendants filed a Motion for Partial Summary Judgment and Opposition to the Motion to Dismiss. Plaintiffs oppose defendants' motion, and in addition, seek summary judgment finding the entire licensing scheme an unconstitutional impingement on the First Amendment, and in the alternative, seek an injunction against the implementation and/or enforcement of the disqualification clause as noted above. With that as background, the Court will now take up the issues before it.

## II. Defendants' Motion to Dismiss

### A. The Mandate

■ As previously noted, the Fifth Circuit mandate required this Court to dismiss the case for lack of standing unless the plaintiff Keeler amended her petition within a reasonable time to challenge the state's overall policy and practice of issuing specialty license plates. In The Third Amended Complaint Keeler indeed challenges the license plate scheme in toto; however, plaintiffs contend that the Third Amended Complaint also amends the Planned Parenthood claim to allow for a remedy that solves the redressability con-

cerns of the 5th Circuit-that is the enjoining of the "disqualification clause" of the Act. They argue that the Third Amended Complaint also adds a claim with respect to Planned Parenthood, that is that the implementation of the Choose Life Council contravenes the Establishment Clause. In addition, Henderson, Loewy, NCJW, and LaMothe, each now allege Establishment Clause violations based on "the Act's symbolic union between the state of Louisiana and fundamentalist Christian organizations" and challenges the Act "on its face and as it has been implemented."

■ Defendants argue that the mandate does not allow for these amendments. Rather, they maintain that the only claim that should be allowed to proceed is the Keeler claim. Undoubtedly, the mandate rule provides that a lower court on remand must "implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court." *United States v. Becerra,* 155 F.3d 740, 753 (5th Cir.1998). However, plaintiffs' position is without merit as the dismissal of the other plaintiffs was based on lack of standing. As stated in one treatise:

> There is little mystery about the res judicata effects of a judgment that dismisses an action for lack of subject-matter or personal jurisdiction or for improper venue. Civil Rule 41(b) provides that a dismissal for lack of jurisdiction or improper venue does not operate as an adjudication upon the merits. This provision means only that the dismissal permits a second action on the same claim that corrects the deficiency found in the first action.

Charles Alan Wright, Arthur Miller, Edward Cooper, 18A *Federal Practice and Procedure* § 4436. As there has been no adjudication on the merits, and plaintiffs could as easily file a new suit and seek

consolidation with this suit, defendants' motion to dismiss based on the mandate is without merit. Judicial economy requires such a decision. Thus, defendants' Motion to Dismiss all plaintiffs save Keeler based on defendants' argument concerning the mandate is **DENIED**.

Thus, the Court must examine whether now, as amended, plaintiffs have standing in light of the Fifth Circuit's reasons in its previous opinion and the specific amendments to the Complaint.

## B. Standing

### 1. Taxpayer Standing

 Henderson, Keeler, Loewy and La-Mothe again allege injury based on the use of their respective tax money being used to support "the symbolic union between the State of Louisiana and fundamentalist Christian organizations established by [the Act]." They further challenge the Act "on its face and as it has been implemented." To the extent that such an allegation is meant as a challenge to the use of tax dollars to make and distribute the Choose Life plates, plaintiffs have not alleged anything that would distinguish their standing under the Third Amended Complaint from the Fifth Circuit's ruling in *Henderson*, 287 F.3d at 379. The Act still has the same provisions to pay for the cost of the administration of the scheme. Thus, the Fifth Circuit's rationale that these allegations are "insufficient" to confer standing for Henderson, Keeler, Loewy and La-Mothe stands, and their claims must be dismissed in that regard.

To the extent that the Third Amended Complaint as to state taxpayer plaintiffs alleges harm based on the use of their income tax dollars to administer the Choose Life statute, again, the Third Amended Complaint has not resolved the Fifth Circuit's concerns. Since according to the Fifth Circuit, the Act itself appears to contradict the plaintiffs' allegation that state income tax dollars would be used for the administration of the statute,[6] as to the new "implementation" claim in the Third Amended Complaint, there can be no standing for the taxpayers based on the Fifth Circuit's rationale.

To the extent that the use of the description of the harm as "the symbolic union between the State of Louisiana and fundamentalist Christian organizations established by the Act" seeks to demonstrate an Establishment Clause violation raising a specter of future impropriety, it would appear under the Fifth Circuit's rationale, there are still no allegations of actual wrong-doing and thus, no standing in that regard either. *Henderson*, 287 F.3d at 380 citing *Bomer*, 274 F.3d at 218.

Likewise, with respect to the new allegations of the taxpayers that they challenge the Act on its face and as it has been implemented, counsel for plaintiffs admitted during oral argument, there have been no payments from the fund. Thus, there are no allegations that distributions have been made in the Third Amended Complaint. Accordingly, the allegations as to taxpayer standing on an "as-applied" basis are without merit.

---

6. The Fifth Circuit stated:

 Under the statute, members of the Council serve on a voluntary basis and are not provided "compensation or reimbursement of any type." La.Rev.Stat. § 27:463.61(E)(1). Additionally, the statute requires the payment of an additional $3.50 fee, in addition to the regular motor vehicle license fees, to offset a portion of the associated administrative costs. *Id.* at § 47:463.61(C). Under these facts, we find that the complained of injury of the state taxpayer plaintiffs, i.e., use of their income tax dollars to administer the Choose Life statute, is insupportable and therefore, insufficient to confer standing to challenge the constitutionality of that statute.

Thus, defendants' motion to dismiss Henderson, Loewy, NCJW, and LaMothe, based on taxpayer status is **GRANTED**.

Next, as the Fifth Circuit did in its opinion, the Court will now examine standing based on Loewy, LaMothe and NCJW's the allegations that their religious beliefs or principles are harmed by the Act's endorsement and advancement of Christian fundamentalism. As noted with respect to the taxpayers' claim above, the allegations in the Third Amended Complaint still do not allege that the mandatory members of the Choose Life Council have yet distributed any money or that they have actually advanced religious ideologies. Indeed, counsel for plaintiffs admitted that there simply have been no payments made yet and thus no allegations to that end are in the Third Amended Complaint. The "appearance of future impropriety" was found by the Fifth Circuit to not satisfy an injury in fact such as to confer standing. *Henderson,* 287 F.3d at 380 relying on *Public Citizen, Inc. v. Bomer,* 274 F.3d 212, 218 (5th Cir.2001). Thus, these plaintiffs do not have standing at this juncture to raise these claims, and the Motion to Dismiss Loewy, LaMothe and NCJW in relation to their religious beliefs being harmed is **GRANTED**.

### 2. Individual Standing

■ The Fifth Circuit focused solely on Keeler's allegations. Keeler has amended her allegations to state:

> In addition, she owns a 1996 passenger car and would like to purchase a prestige license plate expressing her pro-choice views but is unable to do so as a result of the defendants' creation of a viewpoint discriminatory forum through Louisiana's policy and practice of issuing "special prestige license plates," "prestige license plates," and "special license plates," generally codified as La. Rev. stat. §§ 47:463.7–47:463.110 ("the statutory scheme"), pursuant to which the

Legislature has unbridled discretion in determining when to grant or deny a request for a new plate, including those that express Keeler's political viewpoint. (Doc. 58, Third Amended Complaint, ¶ 5). These allegations, along with the paragraphs outlining the statutory scheme in detail (¶¶ 19 –24) are sufficient to meet the Fifth Circuit's requirements. Thus, Keeler has standing to bring this suit.

### 3. Organizational Standing

■ As noted above, in the Fifth Circuit's opinion, the appellate court found that Planned Parenthood did not have standing because the relief it requested failed with respect to redressability. Because the injury complained of by Planned Parenthood, the denial of funds, would not be redressed by eradicating the fund, the Fifth Circuit found that Planned Parenthood had no standing. *Henderson,* 287 F.3d at 382 citing *Association of Cmty. Orgs. for Reform v. Fowler,* 178 F.3d 350, 356 (5th Cir.1999).

In the Third Amended Complaint, as previously noted, plaintiffs seek a declaration that the scheme is unconstitutional. In the alternative, they request that the Court direct defendants to make available a "pro-Choice" license plate with fees like the Pro–Life license with the proceeds of the annual fees to be deposited into a fund to assist needy women who want abortions for health-related reasons and to enjoin the defendants from implementing the last sentence of the Act-that is the disqualification clause.

With these amendments, it would appear thus appear that Planned Parenthood has addressed the redressability infirmities upon which the Fifth Circuit denied the group standing. As such, the Court finds that they have standing. Thus the Motion to Dismiss Planned Parenthood for lack of standing is **DENIED**. However, since the

claims of Planned Parenthood are alleged in the alternative, and become moot in the event the Court finds the entire license plate scheme unconstitutional, the Court will now turn to what is in essence cross-motions for summary judgment on the constitutionality of the license plate scheme.

## III. Cross–Motions Concerning the Constitutionality of the License Plate Scheme Based on the First Amendment

Defendants' argue that as to Keeler's claim, "even as reconstituted as challenging the entire licensing scheme, the claim fails because the license plate constitutes Government speech which is not subject to First Amendment application by a federal court." Plaintiffs have countered with their own motion seeking judgment that the entire scheme is subject to First Amendment forum analysis and is unconstitutional because the scheme discriminates based on viewpoint. A brief overview of the statutory scheme is thus required.

### A. The License Plate Statutory Scheme

It is undisputed that through a series of statutes, Louisiana has established numerous license plates that are available for motor vehicles which differ from the standard license plates required under Louisiana law, see La.Rev.Stat. § 47:505, in that they contain a message over and above identifying the car to which the license plate is attached. The statutes authorizing these alternative plates are codified at La. Rev.Stat. §§ 47:463.3 and 47:463.7–463.16, 47:463.18, 47:463.20, 47:463:22–63.34, 47:463.36–463.110. These plates are called a number of different names-"special license plates", "special prestige license plates", "prestige license plates", and other plates are simply titled *sui generis* according to the organization, cause or issue they

represent. For purposes of this opinion, the Court will refer to these as "prestige license plates."

As alleged in plaintiffs' Third Amended Complaint, the statutes codifying prestige plates vary in several respects, for example:

1. whether an extra fee is required;
2. whether that fee is called a "fee", "royalty" or "donation";
3. the amount of such fee;
4. whether the fee, if any, is a one-time charge or is an annual one;
5. whether the proceeds from such fees are to be given to specific organizations directly or whether the proceeds are to be deposited into the state treasury;
6. whether a design or slogan for the plate is specified in the statute, or is to be determined by some other process;

But each of these plates constitute a form of expression. These expressions or statements can be broken into categories.

One category is those prestige license plates that demonstrate membership in a particular group or association which require the applicant to be a member of the group or association-e.g., § 47:463.7 (special license plate for former prisoners of war issuable only to such individuals); § 47:463.14 (special Farhad Grotto license plates, available only to members of a "Grotto organization" for use by the member in "Grotto parades or for other escort services"); § 47:463.25 (special prestige license plates for veterans of the "Vietnamese conflict"). (See Third Amended Complaint at 7–12).

Another category of prestige license plate expression declares support for an institution or entity, without requiring membership in that group. These states include, for example § 47.463.39 (special

license plate for the United States Olympic Committee, available to any citizen of Louisiana; proceeds to be distributed between the United States Olympic Committee and the Louisiana Games Foundation after deduction of $1 to offset administrative costs); 47:463.54 (special prestige license plate for the Wild Turkey Federation; proceeds ultimately to be placed in the "Louisiana Wild Turkey Stamp Fund"); § 47:463.57 (special prestige license plates available to any citizen of Louisiana, for McKinley High School; proceeds to be forwarded to the McKinley High School Alumni Association, less a "handling fee" of $3.50). § 47:463.67 (special prestige license plates including the phrase "I Support River Region Cancer Center"; proceeds ultimately to be disbursed to the River Region Cancer Screening and Early Detection Center). (*See* Third Amended Complaint 12–15).

Yet another category demonstrates support for a cause or idea. These contain a slogan or support a cause, with some overlap with above noted groups. For example, § 47:463.45 (special prestige license plates bearing "a logo with a picture of a Louisiana black bear"; proceeds to be deposited into the state treasury; state treasurer must then place an equal amount in the Conservation Fund in the "black bear account"); § 47:463.60 (special prestige "Animal Friendly" license plates,) available

to any citizen of Louisiana, provided there is a minimum of one hundred applicants for such plate; proceeds to be deposited into the Pet Overpopulation Fund; also establishing "Pet Overpopulation Advisory Council" to oversee expenditure of the funds. The Act which provided the genesis for this suit, 47:463:61 would be considered a member in this category. (See Third Amended Complaint 15–17).[7]

Regardless of the category, each prestige license plate issued in Louisiana is permitted only by statute rather than by any administrative process. Each demonstrates some form of expression: membership in a group or organization; support for an institution; or endorsement of a cause, slogan or belief. Thus, only through legislative enactment of a statute can an organization, group of individuals, or other entity participate in this form of expression by obtaining and using such a license plate.

It is this scheme that Keeler maintains violates the First Amendment.

### B. Speech

■ The Supreme Court has examined what constitutes "speech" for the purposes of the First Amendment. As stated in *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989):

*License Plates at the Constitutional Crossroads: Vanity Plates, Special Registration Organization Plates, Bumper Stickers, Viewpoints, Vulgarity, and the First Amendment* 54 U. Miami L.Rev. 563, 577 (2000).

Specifically, in plaintiffs' Third Amended Complaint they do not include La.Rev.Stat. § 47:463.2 which embodies the vanity plate provision. In addition, they specifically exclude "certain other safety-or traffic-related alternative license plates, such as plates for handicapped individuals," which appear to be designed to serve a legitimate safety, traffic or law enforcement function.

---

7. The Court would note that there is a distinction between a "vanity plate" and a "prestige plate" or a "specialty plate." Vanity plates are where a state will customize the arrangement of letter and numbers to create a plate for one individual and it cannot be duplicated. A prestige plate or specialty plate is where a license plate is created to refer to a specific group like the Shriners or a school. The plates at issue are a specialty plates. Furthermore, an argument can be made that a specialty plate may constitute a limited public forum, whereas vanity plates should be considered a nonpublic forum. Jack Achiezer Guggenheim & Jed Silversmith, *Confederate*

In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *[Spence v. State of Washington,]* 418 U.S. [405], at 410–411, 94 S.Ct. [2727], at 2730 [41 L.Ed.2d 842 (1974)].

*Id.,* 491 U.S. at 404, 109 S.Ct. at 2539. The Supreme Court has addressed the issue of speech in the context of license plates.

In *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the Supreme Court was faced with the question of "whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public." In that case, the Maynards had been criminally prosecuted for having covered the New Hampshire state slogan "Live Free or Die" on their license plate. "As Jehovah Witnesses, plaintiffs found the slogan to be morally, ethically, religiously and politically abhorrent." *Id.* at 713, 97 S.Ct. at 1434. The Court found that the State could not so require.

In reaching that decision, the Supreme Court found that New Hampshire in effect required that the Maynards use their private property as a "mobile billboard" for the State's ideological message or suffer a penalty since an individual would have to have such a plate on his personal property in order to drive. As such, the Court reasoned that "The State 'invades the sphere of intellect and spirit which is the purposed of the First Amendment to our Constitution to preserve from all official control.'" *Id.* at 715, 97 S.Ct. at 1435.

The Court continued, "The First Amendment protects the right of individuals to hold a point to view different from the majority and to refuse to foster, in the way New Hampshire commands, an idea they find morally objectionable." *Id.* at 715, 97 S.Ct. at 1436. Thus, the Supreme Court has held that license plates constitute speech for purposes of this analysis. Thus, the next question is whether the speech at issue constitutes "government speech" or "private speech."

## C. Government v. Private Speech

■ Defendants contend that these legislative enactments embody government speech that is outside the reach of First Amendment protection and as such, Keeler's claim should be dismissed for failure to state a claim. Defendants state:

> Any and all statutes (and all of the words of a statute) are necessarily state speech spoken by the state legislature. Because the slogans or messages on the state's license plate is mandated by statutory law enacted by the Louisiana Legislature, it is clearly state speech. Even if such messages first appeared as private speech somewhere, when the Louisiana Legislature adopted the words and made them into its own messages for state license plates, those words and messages on those license plates are state speech. The Louisiana state legislature has done nothing to turn the states' specialty license plate program over to private speakers for their private speech in lieu of the messages and slogans of the state. The First Amendment does not allow federal courts to silence state governmental speech, and *fora* analysis does not apply to state governmental speech.

(Doc. 59, Motion to Dismiss at 2–3). The linchpin of this argument is that defen-

dants maintain that the state has not created a forum for private speech.

Indeed, as underscored in *Sons of Confederate Veterans, Inc. v. Commissioner of the Virginia Department of Motor Vehicles*, 288 F.3d 610 (4th Cir.2002), clearly " 'the government can speak for itself.' " *Id.* at 616 *citing Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). The Fourth Circuit in analyzing *Rust v. Sullivan*[8] and *Rosenberger v. Rector and Visitors of the University of Virginia*,[9] stated:

> Thus, even ordinarily impermissible viewpoint-based distinctions drawn by the government may be sustained where the government itself speaks or where it uses private speakers to transmit its message. [*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) ] (citing *Southworth*, 529 U.S. at 229, 120 S.Ct. 1346, 146 L.Ed.2d 193,) for the proposition that "viewpoint-based funding decision can be sustained in instances in which the government itself is the speaker," and *Rosenberger v. Rector and Visitors of Univ. of Va.* [citations omitted] for the proposition that such distinctions may be sustained in "instances, like *Rust*, in which the government 'used private speakers to transmit specific information pertaining to its own program.' " The rationale behind the government's authority to draw otherwise impermissible viewpoint distinctions in the government speech context is the accountability inherent in the political process:

> When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position. *Southworth*, 529 U.S. at 235, 120 S.Ct. 1346. In other words, where the government itself is responsible, and therefore accountable, for the message that its speech sends the danger ordinarily involved in governmental viewpoint-based choices is not present.

Nonetheless, in at least two decisions, federal courts have found unequivocally that prestige plates and statutory schemes creating them constitute private speech, not government speech. *See Sons of Confederate Veterans, supra,* and *Planned Parenthood v. Rose*, 236 F.Supp.2d 564 (D.S.C. 2002).

In *Sons of Confederate Veterans,* the Fourth Circuit considered whether a special statute which prohibited the use of the Confederate flag on a specialty plate for members of the Sons of Confederate Veterans ("SCV")[10] was subject to the First Amendment because the plate constituted private speech rather than government speech.

The scheme in place in Virginia is not unlike that in Louisiana. The General Assembly of Virginia, created a program through which members and supporters of various organizations or groups could be issued "special" license plates. Such

**8.** 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (upholding government's prohibition on abortion-related advice applicable to recipients of federal funds for family planning because government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program)

**9.** 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)(university could not deny use by paper run by Christian editorial staff of funds dedicated to pay for third party printers' work as denial amounted to viewpoint discrimination)

**10.** The flag is the logo of that organization.

plates had to be specifically authorized by statute. The plates bear the logo and motto of the organization as well as the required letters and numbers needed to identify the vehicle. Ordinarily, a group or organization that wanted a plate would contact a member of the General Assembly seeking a bill to authorize the issuance of such a plate. *Sons of Confederate Veterans,* 288 F.3d at 614. Once authorized, the Commissioner of the department of motor vehicles "prescribed" the design of any plate. *Id.* The design for a special plate was the result of a cooperative process between the Commissioner's agent and the group authorized to receive a special plate. Specifically included in the process was the allowance for a group's logo to be included on the plate. *Id.* The Virginia legislature, in legislating the statute which would allow the Sons of Confederate Veterans a plate, prohibited the use of their logo—the Confederate flag. Thus, the SCV brought suit.

█ In reaching its decision that the special license plates constituted private speech, the Fourth Circuit examined four factors previously employed by other courts facing the government versus private speech dilemma, which factors this Court finds helpful in its analysis. They are:

(1) what is the central "purpose" of the program in which the speech in question occurs;

(2) what is the degree of "editorial control" exercised by the government or private entities over the content of the speech;

(3) what is the identity of the "literal speaker"; and

(4) who bears the "ultimate responsibility" for the content of the speech—the government or the private entity.

*Sons of Confederate Veterans,* at 618–19 and cases cited therein. As noted, these factors are neither exhaustive nor always applicable, but instructive in this instance. *Id.* at 619, n. 7.

### 1. Purpose

In *Sons of Confederate Veterans,* with respect to the purpose, the Virginia government took the same position as the defendants in the case herein; the purpose of the plate in the State's eyes was to serve as a vehicle for the expression of government messages honoring those groups for which it authorizes special plates. Likewise, as plaintiffs herein argue, SCV maintained that the purpose was to allow individuals to display their association with and express their pride in the messages or goals of the group for which a special plate was authorized. *Id.*

The Fourth Circuit found both positions too extreme; it concluded that the purpose of the special plate was to produce revenue while allowing, on special plates authorized for private organizations, for the private expression of various views. *Id.* In doing so, the court distinguished the gathering of additional revenues from the use of selective funding decisions as was present and allowable in *Rust.* Furthermore, it noted in reference to the requirement that 350 applicants had to apply for the license within a set period of time prior to the plate being issued, that if the Virginia assembly intended to speak, it is "curious that it requires the guaranteed collection of a designated amount of money from private persons before its 'speech' is triggered." *Id.* at 620. Plus, there was a requirement of "written evidence" that the person purchasing the license was a member of the organization. The court stated:

> These restrictions suggest that the special plate to which they apply are intended by the General Assembly to allow the authorized recipients to express their pride in membership in an organization while facilitating the group's speech. **If**

non-members cannot obtain the plates, those motorist who have them send a personal message by carrying the plates on their vehicles, because the plates identify them as members of the organization.

*Id.* (emphasis added) (citing *Lewis v. Wilson*, 253 F.3d 1077, 1079 (8th Cir.2001)).

Under these criteria, looking at the purpose of the prestige license plate scheme in place in Louisiana, it is pellucid that its purpose is likewise to produce revenue while allowing, on special plates authorized for private organizations, for the private expression of various views. Indeed, much of the revenue produced is funneled to the organizations themselves in the Louisiana program. Many of the plates involved require a minimum number of purchasers prior to production demonstrating that what defendants contend is the Government's speech, is only spoken if someone else pays for it. Finally, as noted, a number of Louisiana prestige plates require proof of membership in the organization prior to being able to purchase same-underscoring the personal nature of the message of the plate.

### 2. Editorial Control

In Virginia, the court found that the state government exercised little, if any, control. Under that scheme, the Commissioner was prescribed the duty of executing the plates and he had only vetoed one plate in the history of the scheme. Furthermore, as noted, the execution of the license plate design was a joint effort and the "Special Plate Design Criteria" that was sent to the plate sponsor contained "detailed instructions for insuring that the design submitted by the sponsor would conform to size and space requirements, but had no guidelines regarding the substantive content." SCV's instance was the only time that the state actually legislated a restriction with respect to the actual plate design. Thus, generally private organizations had the control over the editorial content.

Under the Louisiana scheme, it is apparent that the legislature has simply approved the use of organizations' logos which each organization has created; it has not independently arrived at its "editorial" message. Furthermore, there are apparently instances where the design of the plate is delegated to the Assistant Secretary, Louisiana Department of Public Safety and Corrections, Office of Motor Vehicles. As stated in an affidavit filed in conjunction with the instant motion:

> Sometimes the details of what may be contained on the license plate is [sic] delegated by the Louisiana Legislature to AFFIANT, who possesses the power to make rules and regulations regarding them, but the Louisiana Legislature always reserves to itself the determination of what those license plates shall be. . . .
>
> Even when AFFIANT receives suggestions as to a logo or motto from an organization or entity whom the Legislature wishes to give public recognition by authorizing a special prestige motor vehicle registration license plate for it but does not designate in the statutory law what the logo or motto will be on the license plate, it is only AFFIANT who, under the law, has the final decision and determination whether that suggested logo or motto will be published on not be published on the license plate.

(Affidavit of Kay Hodges, p. 2–3). Thus, by its own affiant's testimony, it appears that are also instances where the legislature delegates and does not even enter into the design process and the editorial content has its genesis in the organization seeking the plate. Thus, this factor demonstrates that the Louisiana legislature does not always control the editorial process and that indeed in actuality, the pro-

cess is a group effort with the organization seeking the plate.

### 3 & 4. Literal Speaker and Ultimate Responsibility

The Fourth Circuit reasoned, that the "literal speaker" and "who bares the ultimate responsibility" for speech in the case before it was the car owner, thus underscoring the private nature of the speech at issue. Recognizing that the plate itself might constitute the "literal speaker" and the state did own the plate, the Court found more compelling the argument using the analysis found in *Wooley*, 430 U.S. 705, 717, 97 S.Ct. 1428. It stated, "Importantly, though, the special plates are mounted on vehicles owned by private persons, and the Supreme Court has indicated that license plates, even when owned by the government, implicate private speech interests because of the connection of any message on the plate to the driver or owner of the vehicle." *Sons of Confederate Veterans*, 288 F.3d at 621. This analysis is equally applicable to the case at bar and militates this Court find that the speech at issue is private not government speech.

The problem with defendants' analysis is that the State ignores the very essence of how these plates come about. The participants in the license plate scheme seek to express a point of view, a private point of view. In order to do so, they must find legislators willing to sponsor a bill and be an organization that is so non-controversial that the bill passes and a plate is created. These plates do not spring from the head of the legislature like Athena from the head of Zeus.

As stated by Jeremy Berry in *Licensing a Choice: "Choose Life" Specialty License Plates and Their Constitutional Implications*, 51 Emory L.J. 1605 (Fall, 2002):

Courts specifically have held specialty license plates are speech for First Amendment purposes because they contain "the extra dimension of an organization name and a symbolic logo" designed by the organization. The notion is that the license plates, particularly the specific markings of the organization's logo, are expressive conduct and not simply a functional tool for vehicle identification.

*Id.* at 1622. Indeed this Court found in its previous ruling that the plates did not constitute "government speech" and it continues in that belief for the reasons stated herein.

### D. Viewpoint Neutrality

■ Having determined that private speech is involved ostensibly on government property, the Court must now analyze the validity of the statutory scheme in light of the First Amendment. "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Assn.*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The Supreme Court has recognized that there are basically three fora: (1) the "traditional public forum," (2) "the designated public forum," and (3) the "nonpublic forum". *Lewis* 89 F.Supp.2d at 1088 *citing Perry*. Examples of traditional public forums are streets and parks that have always been "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. A designated public forum is "a location or channel of communication designated by the government for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Lewis* 89 F.Supp.2d at 1087 *citing Perry*, 460 U.S. at 45–46, 103 S.Ct. at 955. Finally, a nonpublic forum is any forum which is not by tradition or

designation a forum for public communication. *Id.*

■ However, "[w]here the government is not expressing its own policy, either directly or, as in *Rust*, through an intermediary, it **presumptively** violates the First Amendment when it discriminates on the basis of views expressed by private speakers." *Sons of Confederate Veterans,* 288 F.3d at 622 and cases cited therein. The Fourth Circuit again succinctly explained:

> As the Supreme Court has stated, "[i]t is axiomatic that the government may not regulate speech based on ... the message it conveys." *Rosenberger,* 515 U.S. at 828, 115 S.Ct. 2510. Such viewpoint discrimination presumptively is impermissible whether it occurs within or outside a private speech forum. [*Arkansas Educ. Television Comm'n v.] Forbes,* 523 U.S. [666,] 118 S.Ct. 1633[, 140 L.Ed.2d 875 (1998)] (stating that viewpoint discrimination is impermissible even where no forum is created at all); *Rosenberger,* 515 U.S. at 828, 115 S.Ct. 2510 (stating that viewpoint discrimination is presumed impermissible in any forum under forum analysis); *Multimedia Pub. v. Greenville–Spartanburg Airport,* 991 F.2d 154, 159 (4th Cir.1993).

*Id.*

■ The State of Louisiana has created a forum-prestige license plates for privately owned vehicles-that is only open to those organizations the viewpoints of which the State approves. There is no neutrality in the scheme as it stands now; by defendants' own description of the scheme, an organization may only obtain a specialty plate if the Louisiana legislature condones the message so as to adopt it.

Thus, regardless of the type of forum, it is presumptively unconstitutional.[11]

■ Furthermore, defendants have not presented any argument that the scheme presents "the least restrictive means available" to serve a "compelling governmental interest." *Sons of Confederate Veterans,* 288 F.3d at 626. To overcome the presumption of unconstitutionality the government must show that its regulations "serve a compelling state interest and that [they are] narrowly drawn to achieve that end." *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948. The State has not done so.

If the legislature does not approve of the message of the organization, no specialty license plate can be forthcoming. Indeed, a case recently filed in this Court presents another example of the alleged non-neutrality of the process has been presented. In *Butler v. Stalder,* C.A. No. 03–1811, the allegations are starkly similar to the case at bar. In *Butler* an individual alleges to be unable to have a license plate issued for the New Orleans Area Chapter of Parents, Families, and Friends of Lesbians and Gays, Inc. ("P–FLAG").

■ If the State built a convention hall for speech and then only allowed people to speak with whom they agreed with their message, the State's actions would be in contravention of the First Amendment. There is no significant difference in the case before the Court. The manner in which the specialty plates are created is blatantly not viewpoint neutral. As stated by the Fourth Circuit and cited by the district court in *Planned Parenthood:*

> In the realm of private speech or expression, government regulation may not favor one speaker over another.

11. At least one court and a commentator have viewed the creation of specialty plates as creating a designated public fora. *Sons of Confederate Veterans v. Holcomb,* 129 F.Supp.2d 941, 948 (W.D.Va.2001); Berry, *Licensing A Choice,* 51 Emory L.J. at 166. As such, heightened scrutiny as to the constitutionality of the scheme is required.

Similarly, "[t]he government must abstain from regulating speech when the motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Thus, where an evaluation of a given restriction and the surrounding circumstances indicates that one or more speakers are favored over others, and further that the basis for the restriction is in fact the message the disfavored speaker seeks to convey, the restriction violates the First Amendment. Moreover, where restrictions or regulations of speech discriminate on the basis of the content of speech, there is an "inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion . . ."—in other words, to exercise viewpoint discrimination.

*Planned Parenthood,* at 572 citing *Sons of Confederate Veterans* at 624 (quoting *Rosenberger,* 515 U.S. at 828, 115 S.Ct. 2510 and *Turner Broadcasting Sys., Inc. v. F.C.C.,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

Thus, the Court finds that plaintiffs' Motion for Partial Summary Judgment shall be **GRANTED** finding that the entire overall policy and practice under which Louisiana makes available certain specially license plates violates the First Amendment and the Motion to Dismiss Keeler's claim filed by defendants shall be **DENIED.**

Planned Parenthood's claims based on Freedom of Speech and the Establishment Clause are brought as alternative claims under the Third Amended Complaint. Because the Court has granted plaintiff's partial summary judgment declaring the entire licensing scheme unconstitutional as it is in violation of the First Amendment as it is not viewpoint neutral, the alternative claims of Planned Parenthood are rendered **MOOT,** and the State's Motion to Dismiss these claims is likewise **MOOT.**

The licensing scheme in Louisiana has no standards, parameters, guidelines or other criteria by which a prestige plate can be issued to an organization or group of like-minded citizens. As a result, the threat of discrimination based on viewpoint invariably must loom over any applicant. The reason for this is that whether or not a license plate is issued is subject to the uncontrolled discretion of the legislature. This Court originally had one issue before it, specifically, the constitutionality of Choose Life Statute, La.Rev.Stat. 47:463.61. As a result of the Fifth Circuit's ruling, the plaintiff has levied a constitutional attack as to the entire prestige licensing scheme which has been successful. Therefore, although not the plaintiff's original intent, the injunction herein applies to the future issuing of all such licenses.

The Louisiana legislature has the option of enacting a scheme which could contain "narrow, objective and definitive standards to guide the licensing authority." *Planned Parenthood,* 236 F.Supp.2d 564, 573 (D.S.C.2002) citing the Supreme Court *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) and cases cited therein. With such a scheme, an applicant for a license plate would not be as readily vulnerable to viewpoint discrimination and the guidelines could be used to vet for reasons other than viewpoint, such as obscenity, confusion to law enforcement authorities, duplication and the like. This choice remains with the legislature as it is beyond the authority of this Court to order the Legislature to issue a "Choose Choice" license plate.

The Court emphasizes that the Louisiana legislature is of course free to speak, but it cannot prevent its citizens from voicing opinions with which the State disagrees in a forum of its own creation un-

less there is a compelling state interest to do so. Although a debate over a license plate may seem quotidian in the spectrum of human events, state censorship of private speech is inimical to a viable and dynamic democracy. State control of private speech is an insidious incursion into the bedrock of freedom. It must not be permitted and is not permitted under our Constitution.[12]

In addition, pursuant to 42 U.S.C. § 1983, plaintiff is entitled to attorneys' fees. Plaintiff shall submit its motion for attorneys' fees by August 8, 2003, along with supporting documentation. No notice of hearing is required with said filing. Defendants shall reply by August 22, 2003. In the event that either party wishes to have an evidentiary hearing on the matter after briefs are submitted, such a request shall be made by August 29, 2003. Otherwise the matter shall be deemed submitted on the papers. Accordingly,

**IT IS ORDERED** that judgment for plaintiff Doreen Keeler and against defendants Richard L. Stalder, Secretary of the Louisiana Department of Public Safety and Corrections and John N. Kennedy, Treasurer of Louisiana, be entered, and the named defendants are hereby EN-

**JOINED** from enforcing or implementing La.Rev.Stat. §§ 47:463.3 and 47:463.7–463.16, 47:463.18, 47:463.20, 47:463:22–63.34, 47:463.36–463.110.

---

12. Immediately prior to the Court's entering its Order and Reasons and Judgment in this case, it received a letter from the State of Louisiana, Department of Justice, Assistant Attorney General Roy a. Mongrue, Jr., who represents the defendants in this matter. In it, he brought the Court's attention to a recent Fifth Circuit case, *American Civil Liberties Union Foundation of Louisiana v. Bridges,* 334 F.3d 416 (5th Cir.2003). The Court also received a written response in letter form from plaintiffs' attorneys.

The cited case involves the application of the Tax Injunction Act, 28 U.S.C. § 1341, to certain legislative exemptions relating to sales and use taxes granted to churches and synagogues. None of the pleadings before the Court in any way implicate the Tax Injunction Act. Nor was it even obliquely referenced in oral argument. There was no motion re-

questing permission to file additional briefs or to amend defendants' pleadings. Regardless of these deficiencies, the Court has reviewed the noted case and treats it as having been properly raised. It finds that the case at bar does not even remotely relate to the Tax Injunction Act. The legislation at issue was enacted at the request of the interested groups who desired special license plates. Under no circumstances are the fees charged for the cost of the plates in any way to be considered a "tax." *Neinast v. State of Texas,* 217 F.3d 275 (5th Cir.2000). This charge is called a "fee" in the specific statute authorizing "Choose Life" plates. La.Rev.Stat. 47:466.61 and the word "fee" is used throughout the prestige license plate statutes. Citizens do not impose taxes on themselves and this late citation borders on the absurd.