The Honorable Buddy Blair State Representative 500 N. 18th Street Fort Smith, AR 72901-3306
Dear Representative Blair:
I am writing in response to your request for my opinion on two questions I will paraphrase as follows:
 1. Pursuant to provisions of Act 344 of 2003, may the state legally appropriate and collect special revenue funds to be distributed to private entities for non-governmental purposes? Specifically, may the legislature authorize the issuance of specialty license plates bearing the slogan "Choose Life," with the proceeds to be distributed to nonprofit organizations that avoid providing any abortion-related services and instead counsel pregnant girls and women to pursue adoption as an alternative?
 2. Is the requirement of Act 858 of 2003 that materials harmful to minors be maintained so that the lower 2/3rds not be exposed to view and segregated in a manner that physically prohibits access to the material by minors unconstitutional? Can a bookstore comply with the erection of physical barriers without violating the rights to access to the material by adults and still be in compliance with the Americans with Disabilities Act?
RESPONSE
With respect to your first question, I believe a reviewing court would in all likelihood declare Act 344 of 2003 unconstitutional as offending the guarantees of freedom of speech, equal protection and due process. U.S. Const. amends. 1 and 14 and Ark. Const. art. 2, § 6 and §§ 2, 3 and 18. Indeed, federal courts in two states have already held unconstitutional legislation authorizing the issuance of "Choose Life" plates under facts virtually identical to those at issue here. Under applicable case law, it is impermissible for a legislature to adopt a legislative scheme that affords the legislature unfettered discretion to make viewpoint-based classifications regarding what messages individuals may convey on a given topic in a limited public forum. Based on the case law, it appears that Act 344 marks an exercise of such constitutionally impermissible discretion. With respect to the disposition of funds collected pursuant to Act 344 to nonprofit organizations that advocate adoption instead of abortion, I believe the courts would not deem funding such advocacy as violating the principle that public money must be used for a "public purpose," and thus that aspect of the Act would likely withstand judicial scrutiny.
I must decline to address your second question, since it is currently the subject of litigation in the case of Shipley, Inc. d/b/a That Bookstorein Blytheville et al. v. Huckabee et al., Case No. 4-03CV. 00481GTE, United States District Court, Eastern District of Arkansas, Western Division.
Question 1: Pursuant to provisions of Act 344 of 2003, may the statelegally appropriate and collect special revenue funds to be distributedto private entities for non-governmental purposes? Specifically, may thelegislature authorize the issuance of specialty license plates bearingthe slogan "Choose Life," with the proceeds to be distributed tononprofit organizations that avoid providing any abortion-relatedservices and instead counsel pregnant girls and women to pursue adoptionas an alternative?
A. The Statute
Act 344 of 2003, as engrossed on February 6, 11 and 14, 2003 and codified at A.C.A. § 27-15-3901 et seq., authorizes the Director of the Department of Finance and Administration ("DFA") to issue motor vehicle license plates bearing the slogan "Choose Life." Subsection 27-15-3902(a)(3) provides that "[t]he purpose of the special license plate is for a person to support organizations that encourage adoption as a positive choice for women with unplanned pregnancies." Subsection 27-15-3902(a)(1) provides that the license will be designed by an organization called "Choose Life, Inc." and submitted to the DFA Director for approval.[1]
Subsection (b) of this statute provides that the specialty plate shall issue upon payment of a $6,000 fee "by any person, organization, or by any combination of persons or organizations."
Section 27-15-3903 provides that an individual choosing the specialty plate must pay, in addition to the normal registration fee, a $25 fee "to cover design use contribution" and a $10 "handling and administrative fee." The former fee is to be deposited into the state treasury as "special revenues"; the latter to the State Central Services Fund "for the benefit of the Revenue Division of the Department of Finance and Administration," where it will "not be considered or credited to the division as direct revenues." Section 27-15-3905 provides that these fees must be paid annually.
Section 27-15-3904 creates on the books of the Treasurer, Auditor and Chief Fiscal Officer a special revenue fund denominated the "`Choose Life' Adoption Assistance Program Fund," the assets of which will comprise the design use contributions. Two percent of these assets are to be devoted to administrative expenses and 98% to providing, through the Department of Health, grants to "nonprofit organizations" that are qualified to "provide services to the community that include counseling and meeting the physical needs of pregnant women who are committed to placing their children for adoption." Among the restrictions on eligibility to receive these funds is the following:
 Funds shall not be distributed to any organization that is involved or associated with abortion activities, including counseling for or referral to abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising.
A.C.A. § 27-15-3904(d)(1)(A).
B. First Amendment Analysis
In my opinion, Act 344 offends the free-speech provision of theFirst Amendment to the United States Constitution,[2] which is applicable to the states by virtue of the Fourteenth Amendment. SoutheasternPromotions, Ltd. v. Conrad, 420 U.S. 546, 547 (1975); Douglas v. City ofJeannette, 319 U.S. 157, 162 (1943); Gitlow v. New York, 268 U.S. 652,666 (1925).[3]
At issue initially is whether the slogan "Choose Life" constitutes "speech" for purposes of constitutional analysis. Both common sense and clear precedents suggest that it does. As the Supreme Court noted inTexas v. Johnson, 491 U.S. 397, 404 (1989):
 In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." 418 U.S. at 410-411, 94 S.Ct., at 2730.
(Brackets in original.) A pro-life message conveyed on a license plate clearly meets this test. Compare Wooley v. Maynard, 430 U.S. 705, 715
(1977) (holding that the New Hampshire state slogan "Live Free or Die" constituted "speech" that Jehovah's Witnesses could delete from their license plates as "morally objectionable").
The next question for purposes of First Amendment review is whether the "Choose Life" message constitutes "government" or "private" speech — categories that are subject to different constitutional standards of review. Specifically with respect to a "Choose Life" license plate, this distinction was most recently discussed in Henderson v. Stalder,2003 WL 21634684 (E.D. La., July 8, 2003) (No. Civ. A. 00-2237). InHenderson, a Louisiana federal district court, in the course of considering the constitutionality of a legislative scheme authorizing the issuance of "Choose Life" license plates, offered the following analysis of the protection afforded government, as opposed to private, speech:
 [A]s underscored in Sons of Confederate Veterans, Inc. v. Commissioner of the Virginia Department of Motor Vehicles, 288 F.3d 610 (4th Cir. 2002), clearly "`the government can speak for itself.'" Id. at 616 citing Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 229, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). The Fourth Circuit in analyzing Rust v. Sullivan[4] and Rosenberger v. Rector and Visitors of the University of Virginia[5] stated:
 Thus, even ordinarily impermissible viewpoint-based distinctions drawn by the government may be sustained where the government itself speaks or where it uses private speakers to transmit its message. [Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63
(2001)] (citing Southworth, 529 U.S. at 229, 120 S.Ct. 1346, 146 L.Ed.2d 193) for the proposition that "viewpoint-based funding decision[s] can be sustained in instances in which the government itself is the speaker," and Rosenberger v. Rector and Visitors of Univ. of Va. [citations omitted] for the proposition that such distinctions may be sustained in "instances, like Rust, in which the government `used private speakers to transmit specific information pertaining to its own program.'" The rationale behind the government's authority to draw otherwise impermissible viewpoint distinctions in the government speech context is the accountability inherent in the political process:
 When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position.
 Southworth, 529 U.S. at 235, 120 S.Ct. 1346. In other words, where the government itself is responsible, and therefore accountable, for the message that its speech sends the danger ordinarily involved in governmental viewpoint-based choices is not present.
2003 WL 21634684, at 12-13 (brackets in original).
Having thus delineated the potentially pertinent scope of government speech, the court in Henderson pointed out that "prestige plates and statutory schemes creating them" have been unequivocally labeled as implicating only private, not government, speech. Id. at 13, citing Sonsof Confederate Veterans, supra, and Planned Parenthood v. Rose,236 F.Supp.2d 564 (D.S.C. 2002). The court described as follows the Virginia statutory scheme at issue in Sons of Confederate Veterans — a scheme quite similar to the one in effect in Arkansas:
 The scheme in place in Virginia is not unlike that in Louisiana. The General Assembly of Virginia, created a program through which members and supporters of various organizations or groups could be issued "special" license plates.[6] Such plates had to be specifically authorized by statute. The plates bear the logo and motto of the organization as well as the required letters and numbers needed to identify the vehicle. Ordinarily, a group or organization that wanted a plate would contact a member of the General Assembly seeking a bill to authorize the issuance of such a plate. Sons of Confederate Veterans, 288 F.3d at 614. Once authorized, the Commissioner of the department of motor vehicles "prescribed" the design of any plate. Id. The design for a special plate was the result of a cooperative process between the Commissioner's agent and the group authorized to receive a special plate. Specifically included in the process was the allowance for a group's logo to be included on the plate. Id. The Virginia legislature, in legislating the statute which would allow the Sons of Confederate Veterans a plate, prohibited the use of their logo — the Confederate flag. Thus, the SCV brought suit.
 In reaching its decision that the special license plates constituted private speech, the Fourth Circuit examined four factors previously employed by other courts facing the government versus private speech dilemma, which factors this Court finds helpful in its analysis. They are:
 (1) what is the central "purpose" of the program in which the speech in question occurs;
 (2) what is the degree of "editorial control" exercised by the government or private entities over the content of the speech;
(3) what is the identity of the "literal speaker"; and
 (4) who bears the "ultimate responsibility" for the content of the speech — the government or the private entity.
 Sons of Confederate Veterans, at 618-19 and cases cited therein. As noted, these factors are neither exhaustive nor always applicable, but instructive in this instance. Id. at 619, n. 7.
2003 WL 21634684 at 13 (brackets in original; footnotes omitted).
Applying the first of these criteria to the issue of whether a license plate reading "Choose Life" constituted governmental or private speech, the district court in Henderson concluded "it is pellucid that its purpose is likewise to produce revenue while allowing, on special plates authorized for private organizations for the private expression of various views." Id. at 14. In the present case, the statutory scheme set forth in Act 344 is not designed generally to produce revenue, but rather to finance adoption counseling services. However, notwithstanding this difference, I believe an individual's election to promote the "Choose Life" message on a license plate clearly constitutes private speech for purposes of constitutional analysis. See Rose, 236 F.Supp.2d at 570-71
(concluding that a "Choose Life" license plate embodied private, not government, speech).
With respect to the second factor recited in Sons of ConfederateVeterans, I am struck by the fact that a private organization, Choose Life, Inc., is responsible for designing the license plates at issue, although the Director of DFA has ultimate authority for design approval. A.C.A. § 27-15-3902. Nothing in this arrangement would incline me to characterize the slogan as government, as opposed to private, speech. SeeHenderson, 2003 WL 21634684, at 14-15 (concluding that where legislature has only approval authority over "Choose Life" plate design, the editorial control is best characterized as private).
In applying the third and fourth Sons of Confederate Veterans factors, the court in Henderson offered the following analysis, with which I fully concur:
 The Fourth Circuit reasoned, that the "literal speaker" and" who bares [sic] the ultimate responsibility" for speech in the case before it was the car owner, thus underscoring the private nature of the speech at issue. Recognizing that the plate itself might constitute the "literal speaker" and the state did own the plate, the Court found more compelling the argument using the analysis found in Wooley, 430 U.S. 705, 717, 97 S.Ct. 1428. It stated," Importantly, though, the special plates are mounted on vehicles owned by private persons, and the Supreme Court has indicated that license plates, even when owned by the government, implicate private speech interests because of the connection of any message on the plate to the driver or owner of the vehicle." Sons of Confederate Veterans, 288 F.3d at 621. This analysis is equally applicable to the case at bar and militates this Court find that the speech at issue is private not government speech.
In my opinion, then, the display of a "Choose Life" message on a license plate is clearly private speech. As the Court noted in Perry, when the government offers any of its property as a forum for private speech, "it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." 460 U.S. at 46. The court in Henderson summed up the applicable standard by declaring that a legislature "cannot prevent its citizens from voicing opinions with which the State disagrees in a forum of its own creation unless there is a compelling state interest to do so." 2003 WL 21634684, at 18; see also United States v. Kokinda,497 U.S. 720, 726-27 (1990); Perry, 460 U.S. at 45; Carey v. Brown,447 U.S. 455, 461 (1980) (together establishing that regulation of speech in traditional or limited fora is subject to strict scrutiny, is presumed unconstitutional and will be permitted only if narrowly tailored to serve a compelling government interest); Wooley, 430 U.S. at 717 (holding that under this standard New Hampshire could not constitutionally compel individuals to display on their license plates the motto "Live Free or Die"); Jack Achiezer Guggenheim Jed M. Silversmith, ConfederateLicense Plates at the Constitutional Crossroads: Vanity Plates, SpecialRegistration Organization Plates, Bumper Stickers, Viewpoints,Vulgarity, and the First Amendment, 54 U. Miami L.R. 563, 576-79 (2002) (concluding that "courts should characterize a specialty license plate as a limited public forum[7] subject to strict scrutiny").
Moreover, the Supreme Court has verged on declaring outright that viewpoint discrimination is a particularly offensive form of content discrimination that can never survive a strict scrutiny analysis. InRosenberger v. Rector and Visitors of the University of Virginia,515 U.S. 819, 829-30 (1995), the Court remarked:
 [I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.
This presumption of impermissibility in viewpoint discrimination is apparently so strong that it is effectively irrebuttable:
 Viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.
Id. at 829. The Court has apparently concluded that a state's interest in discriminating among speakers based upon their various viewpoints on a particular subject can never be sufficiently "compelling" to survive strict scrutiny. Professor Jacobs summarizes this bottom-line principle as follows:
 The government can be "selective" according to a speaker's topic or status. It cannot, however, discriminate among speakers for the purpose of favoring or suppressing a particular point of view.
Jacobs, supra at 446 (footnotes omitted).
In the present case, I believe the legislature has clearly engaged in viewpoint discrimination in contravention of the First Amendment. As the court noted in Henderson:
 The State of Louisiana has created a forum — prestige license plates for privately owned vehicles — that is only open to those organizations the viewpoints of which the State approves. There is no neutrality in the scheme as it stands now; by defendants' own description of the scheme, an organization may only obtain a specialty plate if the Louisiana legislature condones the message so as to adopt it. Thus, regardless of the type of forum, it is presumptively unconstitutional.
 Furthermore, defendants have not presented any argument that the scheme presents "the least restrictive means available" to serve a "compelling governmental interest." Sons of Confederate Veterans, 288 F.3d at 626. To overcome the presumption of unconstitutionality the government must show that its regulations "serve a compelling state interest and that [they are] narrowly drawn to achieve that end." Perry Educ. Ass'n, 460 U.S. at 45, 103 S.Ct. 948.
2003 WL 21634684, at 17. In my opinion, the legislative scheme that led to the enactment of Act 344 suffers from the same constitutional infirmity.[8]
I believe a reviewing court would reach the same conclusion based upon the slightly different analysis the Supreme Court has developed in cases specifically dealing with licensing. These cases strongly suggest that a plaintiff would prevail in a facial challenge to the overall legislative scheme authorizing the issuance of specialty license plates, including "Choose Life" plates, without even having to prove actual viewpoint discrimination. As the Court noted in Forsyth County, Georgia v.Nationalist Movement, 505 U.S. 123, 133 n. 10 (1992):
 "It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940). Accordingly, the success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so.
The Court in Thornhill described this liberality in entertaining facial challenges to "an appreciation of the character of the evil inherent in a licensing system." 310 U.S. at 97. In Rose, these principles led the court to adopt the following reasoning in striking a Louisiana "Choose Life" license plate program that was materially indistinguishable from the one described in Act 344:
 The same licensing case precedents which gave the plaintiffs enhanced First Amendment standing also require this court to hold that the Act is void on its face. Fewer principles are better established in First Amendment law than the principle that exercise of the right of free speech may not be subjected to the unlimited discretion of public officials:
 [I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship. Eg. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Staub v. City of Baxley, 355 U.S. 313, 321-22, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). . . . [T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused. . . .
 As we said in Thornhill: . . . "The power of the licensor . . . is pernicious not merely by reason of the censure of particular comments but by the reason of the threat to censure comments on matters of public concern."
 City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. at 757, 108 S.Ct. at 2144 (emphasis added in part) (quoting Thornhill v. State of Alabama, 310 U.S. at 97, 60 S.Ct. at 741-42).
 Thus, in a recent articulation of the doctrine based on the above free speech principles, the Supreme Court held:
 [A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain" narrow, objective, and definite standards to guide the licensing authority." Shuttlesworth, 394 U.S. at 150-51, 89 S.Ct. at 938; see also Niemotko v. Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951). The reasoning is simple: If the permit scheme "involves appraisal of facts, the exercise of judgment, and the formation of an opinion" by the licensing authority, "the danger of censorship and of abridgement of our precious First Amendment freedoms is too great" to be permitted.
 Forsyth County v. Nationalist Movement, 505 U.S. at 134, 112 S.Ct. at 2401-02 (quoting Cantwell v. Connecticut, 310 U.S. 296, 305, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940) and Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975)).
236 F.Supp.2d at 572-73 (emphasis in original).
In accordance with these precedents, the court in Rose concluded that the "Choose Life" license plate statute at issue was void because it was enacted "pursuant to the uncontrolled discretion of the legislature, which was free to, and undoubtedly did, approve a license plate with a slogan popular with its constituents." Id. at 573. See also Henderson,2003 WL 21634684, at 18 (voiding an entire specialty licensing scheme because "whether or not a license plate is issued is subject to the uncontrolled discretion of the legislature").[9] However, the court inHenderson did qualify its conclusions by offering the following:
 The Louisiana legislature has the option of enacting a scheme which could contain "narrow, objective and definitive standards to guide the licensing authority." Planned Parenthood, 2002 WL 31906116, *9 (D.S.C. December 26, 2002) citing the Supreme Court Forsyth County v. Nationalist Movement, 505 U.S. at 134 and cases cited therein. With such a scheme, an applicant for a license plate would not be as readily vulnerable to viewpoint discrimination and the guidelines could be used to vet for reasons other than viewpoint, such as obscenity, confusion to law enforcement authorities, duplication and the like. This choice remains with the legislature as it is beyond the authority of this Court to order the Legislature to issue a "Choose Choice" license plate.
2003 WL 21634684, at 18.
 Henderson and Rose are the only decisions I have located in which courts have reached the merits of constitutional challenges to the production of "Choose Life" license plates, and in both instances, for reasons I consider valid, the courts struck the legislation authorizing the plates. However, I will note that several other courts have faced the issue and declined to reach the merits because they concluded that the named plaintiffs for various reasons lacked standing to proceed. See Henderson v. Stalder, 287 F.3d 374 (5th Cir. 2002) (reversing and remanding for amendment of pleadings filed in Henderson v. Stalder, 112 F.Supp.2d 585 (E.D. La. 2000), in which the court had ignored the issue of standing in declaring the challenged legislation constitutionally suspect);[10] Women's Emergency Network v. Bush, 323 F.3d 937 (11th
Cir. 2003) (specific individuals and network, having failed to request a "Choose Choice" license plate, lacked standing because unable to show actual injury in fact); Hildreth v. Dickinson, 1999 WL 33603028 (M.D. Fla. 1999) (same). See generally Carolyn Kelly MacWilliam, Validity, Construction, and Operation of State Statutes Regulating Issuance of Special or Vanity License Plates, 2003 A.L.R.5th 15 (2003) (discussing, inter alia, the factors courts have considered in determining standing and ripeness). I will not here belabor the courts' standing analyses in these cases.
C. Fourteenth Amendment Analysis
In Rose, Planned Parenthood and various individual plaintiffs asserted not only First Amendment violations relating to a "Choose Life" license plate scheme, but also violations of the Fourteenth Amendment to the United States Constitution. Specifically, the plaintiffs contended that the scheme "violates the Fourteenth Amendment by placing an undue burden on Planned Parenthood's patients' rights to choose an abortion; and that it infringes plaintiffs' Fourteenth Amendment rights to equal protection and due process." 236 F.Supp.2d at 566. However, because it disposed of the case purely on First Amendment grounds, the court did not feel obliged to address the Fourteenth Amendment claims. Id. at 567 n. 3.
In Burson v. Freeman, 504 U.S. 191, 196 (1992), the Supreme Court observed:
 The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . . ." This Court, in Thornhill v. Alabama, 310 U.S. 88, 95 (1940), said: "The freedom of speech . . . which [is] secured by the First Amendment against abridgment by the United States, [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State."
See Police Department of Chicago v. Mosley, 408 U.S. 92, 96 (1972) ("[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."); see also First National Bank ofBoston v. Bellotti, 435 U.S. 765, 780 (1978) ("Freedom of speech and the other freedoms encompassed by the First Amendment always have been viewed as fundamental components of the liberty safeguarded by the Due Process Clause, see Gitlow v. New York, 268 U.S. 652, 666 (1925) (opinion of the Court); id., at 672 (Holmes, J., dissenting); NAACP v. Alabama ex rel.Patterson, 357 U.S. 449, 460 (1958); Stromberg v. California,283 U.S. 359, 368 (1931); De Jonge v. Oregon, 299 U.S. 353, 364 (1937); Warren, The New "Liberty" Under the Fourteenth Amendment,
39 Harv. L. Rev. 431 (1926). . . ."). In Burson, the Court noted that "[u]nder either a free speech or equal protection theory, a content-based regulation of political speech in a public forum is valid only if it can survive strict scrutiny. Carey v. Brown, 447 U.S. 455,461-462 (1980)." 504 U.S. at 197-98 n. 3.
 In my opinion, given that the likely abridgement of fundamental free speech rights discussed above is based upon impermissibly classifying private speech, I believe a Fourteenth Amendment analysis would yield precisely the same result as a First Amendment analysis — namely, that the scheme set forth in Act 344 of 2003 is unconstitutional.[11] In making this point, I must stress again that for First Amendment purposes, it is not simply the fact of an exercised viewpoint discrimination that is constitutionally repugnant, but rather the very threat of such discrimination built into a system that affords the government excessive discretion in determining what speech to allow on a particular subject in a limited or designated public forum of the government's own creation. Forsyth, 505 U.S. at 133 n. 10 (citing Thornhill, 310 U.S. at 97). Accordingly, the pertinent classes under Act 344 for purposes of equal protection analysis are, on the one hand, those individuals who elect to display "Choose Life" license plates and, on the other, those who face the risk that the legislature, upon request, might refuse to authorize the issuance of pro-choice plates.[12] Applying the authorities discussed above, this classification would appear to be unconstitutional unless decisionmaking authority were vested in an administrative agency whose discretion regarding the issuance of plates on a particular subject was circumscribed by "narrow, objective and definitive standards to guide the licensing authority." Planned Parenthood, 2002 WL 31906116, at 9
(citing Forsyth, 505 U.S. at 134 and cases cited therein).
As the South Carolina District Court noted in Rose:
 There are inherent problems with the state legislature issuing special plates on an ad hoc basis. As one commentator has observed:
 The current legislatively-run specialty plate programs mix two constitutionally inconsistent commands. The first is for legislators to enact laws that reflect the majority interests and values. The second is for them to administer a private speech forum in a way that does not discriminate according to viewpoint. The conflicting mandates render it almost certain that the administration of a private speech forum by the legislature will result in viewpoint discrimination. The legislature's broad discretion to enact or fail to enact laws based upon its perception of the public interest make[s] it almost impossible for courts to determine if the constitutionally prohibited viewpoint discrimination has occurred.
 These observations lead to the conclusion that a legislature cannot constitutionally run a private speech forum. Of course states can choose to make specialty license plates available to their citizens. To do so, however, they must remove administration of the program from the legislature. With clear, non-viewpoint discriminatory standards, administered consistently by an entity subject to meaningful judicial review, a specialty license plate program can meet the Constitution's free speech guarantee.
Jacobs, supra [53 Fla. L. Rev.], at 473.
 236 F.Supp.2d at 574. In my opinion, the scheme enacted in Act 344 contains none of the administrative and judicial protections described in this passage. Accordingly, I believe a reviewing court would conclude it violates both the free speech provisions of the First Amendment and the equal protection and due process guarantees of the Fourteenth Amendment.[13]
D. The Distribution Scheme
Your question deals in part with the provisions of Act 344 that address the distribution of revenues collected from the sale of specialty plates. As reflected in my summary of the legislation above, the proceeds of the sales are deposited into a special revenue fund for distribution to "nonprofit organizations" committed to the goal of adoption counseling. These funds are then distributed by the state to presumably private nonprofit organizations committed to activities that the state has expressly identified as serving a public purpose.
You suggest in your request that the revenues are earmarked pursuant to the legislation to go to "private entities for non-governmental purposes." I question whether this summary is accurate. In my opinion, these particular provisions of Act 344 involve only the government's permissible implementation through private entities of a program it has deemed serves a public purpose.[14] In Rust, the Supreme Court made clear that the government was perfectly free to provide family counseling of the sort at issue here through private actors who committed to refrain from providing any abortion-related advice. 500 U.S. at 192-200. As discussed above, the court in Henderson reviewed at some length the post-Rust case law confirming that such viewpoint discrimination is permissible in the course of administering a government program. See2003 WL 21634684, at 12. I believe this standard clearly applies in this instance to render the revenue-distribution provisions of Act 344 constitutionally unassailable.
 CONCLUSION
I have not been asked, and I will not attempt, to set forth any detailed plan to address the problems that I believe render Act 344 unconstitutional. However, I will offer some general principles that I believe the legislature would likely consider in crafting remedial legislation. First, it is constitutionally impermissible for a legislature to adopt any scheme that enables it to approve individual applications for either specialty or vanity plates. As discussed above, the legislature's appropriate role with respect to the issuance of such plates is to set forth standards for their issuance, leaving it to administrative agencies to adopt conforming regulations and to apply those standard in particular instances. To date, the few courts to address the issue have been unanimous in striking systems that allows unbridled legislative discretion in issuing specialty license plates. The very existence of such systems violates the First Amendment, regardless of whether the legislature has in fact exercised viewpoint discrimination. Second, in order to avoid offending the constitution, legislative standards restricting speech in a designated or limited public forum must be viewpoint-neutral and narrowly tailored to serve a compelling state interest. In order to meet this daunting test, legislative standards should be as objective as possible, thereby minimizing the danger that administrative agencies will be afforded excessive, if not unbridled, discretion in applying the law. The adoption of objective standards further maximizes the likelihood that similarly situated speakers will be provided equal access to a forum, thus avoiding the cardinal sin of viewpoint discrimination. Finally, such objectivity enables the courts systematically to review both the standards themselves and, in particular instances, administrative application of those standards.
Question 2: Is the requirement of Act 858 of 2003 that materials harmfulto minors be maintained so that the lower 2/3rds not be exposed to viewand segregated in a manner that physically prohibits access to thematerial by minors unconstitutional? Can a bookstore comply with theerection of physical barriers without violating the rights to access tothe material by adults and still be in compliance with the Americans withDisabilities Act?
I must respectfully decline to answer these questions, which my inquiries reveal are the subject of pending litigation in the case of Shipley,Inc. d/b/a That Bookstore in Blytheville et al. v. Huckabee et al., Case No. 4-03CV. 00481GTE, United States District Court, Eastern District of Arkansas, Western Division. In order to avoid encroaching upon exclusively judicial prerogatives, it has long been the policy of this executive-branch office to avoid rendering opinions on matters that are pending in the courts.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
[1] My inquiries reveal that Choose Life, Inc. was incorporated in 1997 as an IRC 501(c)(3) nonprofit corporation that solicits donations and whose employees draw no salaries. http://www.choose-life.org/aboutus.html. The organization recites as its purpose: "To work with interested citizens within Florida and other states to create a specialty license plate with the slogan `Choose Life' whose proceeds would be used to facilitate and encourage adoption as a positive choice for women with unplanned pregnancies." http://www.choose-life.org/purpose.html. It reportedly undertakes activities "in support of women in crisis pregnancies who would commit to having their babies and placing them for adoption rather than opting for abortion." http://www.choose-life.org/story.html. It reports that as a result of its efforts, "Choose Life" plates are now "a reality in Florida, Louisiana, Oklahoma, Hawaii, Mississippi, Alabama, Arkansas, Montana and before the legislature in a dozen more." http://www.choose-life.org/aboutus.html. It further represents that it "is now working with individuals and groups from 41 states who have inquired about how to start a Choose Life license plate effort of their own." http://www.choose-life.org/story.html.
Totally apart from the primary constitutional issues discussed below, I question whether Act 344 can invest in a private corporation the power to initiate design considerations without running afoul of Ark. Const. art. 12, § 2, which provides:
 The General Assembly shall pass no special act conferring corporate powers, except for charitable, educational, penal or reformatory purposes, where the corporations created are to be and remain under the patronage and control of the state.
I believe any constitutional infirmity arising from this provision might have been avoided if the state had made its arrangements with Choose Life, Inc. after the legislature enacted Act 344.
[2] U.S. Const. amend. 1: "Congress shall make no law . . . abridging freedom of speech."
[3] Although Ark. Const. art. 2, § 6, which likewise guarantees freedom of speech, is sometimes invoked in Arkansas cases, it is often subordinated in favor of reliance on United States Supreme Court case law interpreting the First Amendment. See e.g., Arkansas Democrat-Gazette v.Zimmerman, 341 Ark. 771, 20 S.W.3d 301 (2000); Eaton v. Supreme CourtCommittee on Professional Conduct, 270 Ark. 573, 607 S.W.2d 55 (1980). I have not found any express discussion by an Arkansas court of whether this provision is indeed coextensive with the First Amendment or whether it might be construed to provide greater protection. See, however, Op. Att'y Gen. No. 98-017 (stating that "[t]his provision has not been interpreted to provide any greater general protection than is provided by the U.S. Constitution); and Op. Att'y Gen. 90-221 (opining that art. 2, § 6 would be construed coextensively with the First Amendment for determining the existence of a "public forum" for initiative signature collecting).
[4] 500 U.S. 173 (1991) (upholding government's prohibition on abortion-related advice applicable to recipients of federal funds for family planning because government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program).
[5] 515 U.S. 819 (1995) (university could not deny use by paper run by Christian editorial staff of funds dedicated to pay for third party printer's work as denial amounted to viewpoint discrimination).
[6] Some clarification of terms might be warranted. "Special" or "specialty" license plates promote a "group or cause on the portion of the plate not devoted to the letter/number identifying configuration." Leslie Jacobs, Free Speech and the Limits of Legislative Discretion: TheExample of Specialty License Plates, 53 Fla. L. Rev. 419, 424 (2001). "Vanity" license plates are indistinguishable from standard state-issued plates except for the fact that the "letter and number combinations are chosen by car owners to convey a message." Marybeth Herald, Licensed toSpeak: The Case of Vanity Plates, 72 U. Colo. L. Rev. 595, 608 (2001). "Choose Life" plates are clearly "specialty" plates pursuant to the former definition. Statutory and case law further occasionally use the term "prestige plates" to refer to one or the other of these categories.See, e.g., Henderson, 2003 WL 21634684, at 13 (using the term to refer to specialty plates) and A.C.A. § 27-14-1101 et seq. (Repl. 1994) (using the term to refer to vanity plates).
For a general history of specialty license plates introduced in various jurisdictions, see Katharine Marsh, License to Shill, 2003-FEB. Legal Aff. 50 (2003).
[7] As the court noted in Rose, the courts recognize three varieties of forum: "(1) traditional public fora, such as streets, parks, and sidewalks; (2) designated [or limited] public fora; and (3) nonpublic fora." 236 F.Supp.2d at 571. A license plate is a limited public forum insofar as the government makes it available for only restricted private speech activity.
[8] I should note that the Supreme Court has recognized instances in which the government not only can but must discriminate on the basis of content. In National Endowment for the Arts v. Finley, 524 U.S. 569, 586
(1998), the Court acknowledged that the National Endowment for the Arts' mandate to promote "excellence" in the arts necessarily entails an exercise of discretion that would be impermissible in noncompetitive subsidies. I consider the legislative process of authorizing "Choose Life" plates — and, for that matter, all specialty vehicle identification plates — to be distinguishable from the situation the Court considered inFinley. With respect to the government's promotion of particular artists through NEA grants, the government's acknowledgment of "excellence" is itself a form of government speech and, as such, does not trigger the strict First Amendment analysis that would apply to discrimination among viewpoints expressed on license plates. I do not believe that the governmental process of approving certain license plates based upon the application of what should be viewpoint-neutral criteria should be considered in any sense analogous to the NEA's task of choosing and supporting what it considers to be superior art. As Jacobs points out:
 This "inherently content-based . . . threshold" [i.e., the NEA's basing its grants on its perception of quality] distinguishes the program from those where the Government "indiscriminately `encourage[s] a diversity of views from private speakers.'" In the latter, a court can require that access criteria be viewpoint-neutral, whereas in the former "absolute neutrality is simply `inconceivable.'"
Jacobs, supra at 456 (footnotes omitted; quoting Finley at 585-86).
[9] In possible recognition of its obligation to be neutral in approving specialty plates, the Arkansas legislature in 1997 declined to approve a specialty plate for the Knights of Columbus, fearing that approval might prompt the Knights of the Ku Klux Klan to also request a plate. Putting Brakes on Specialty Vehicle Tags, Memphis Commercial Appeal, April 21, 1997, at B3. This concern appears to have been somewhat belated, given that the legislature had already approved 65-70 specialty plates as of that date. Id. The article further reports that although "[s]pecialty tags came to Arkansas in the 1970s," their proliferation slowed in the 1997 legislative session, largely as the result of complaints by police that design variation among Arkansas plates made it harder to read license plate numbers. The most recent legislature has shown no such compunction. During its regular 2003 legislative session, the General Assembly enacted a variety of laws authorizing additional specialty plates. See Acts 344 ("Choose Life" plates); 868 (constitutional officer plates); 1004 (breast cancer education, research and awareness plates); 1040 (University of Arkansas Division of Agriculture plates); 1150 (Arkansas Cattlemen's Foundation plates); and 1302 (African-American fraternity and sorority plates); and 1343 (Boy Scouts of America plate).
[10] For an instructive critique of the court's analysis in this case, see Jennifer L. Achilles, Henderson v. Stalder: Fifth Circuit UsesStanding Doctrine to Put Louisiana's "Choose Life License Plate Law Backon Its Feet, 77 Tul. L. Rev. 789 (2003).
[11] The analytical overlap between First and Fourteenth Amendment analysis on this issue may help explain why one commentator simply declined to address equal protection issues, even in the course of acknowledging that they had been raised, if not resolved, in various legal actions. Jeremy T. Berry, Comment, Licensing a Choice: "ChooseLife" Specialty License Plates and Their Constitutional Implications, 51 Emory L.J. 1605, 1607 n. 16 (2002).
[12] This legislative scenario in fact played out as described in Florida — a state that accorded legislators "unfettered discretion" to approve specialty plates — when the legislature approved the issuance of "Choose Life" plates but rejected a proposed amendment that would also have authorized the issuance of "Pro Choice" plates, with proceeds of the latter to be distributed among reproductive service organizations that included abortion counselors. See Women's Emergency Network,323 F.3d at 941.
[13] I appreciate that this conclusion might apply not only to Act 344, but also to the entire range of legislation authorizing the issuance of specialty and vanity plates. However, given the narrow focus of your request, I will not here consider what might be the broader implications of my opinion.
[14] As a general proposition, in order to pass constitutional muster, any use of public funds must serve a "public purpose." See generallyChandler v. Board of Trustees of the Teacher Retirement System of theState of Arkansas, 236 Ark. 256, 356 S.W.2d 497 (1963); Ark. Ops. Att'y Gen. Nos. 92-188 and 91-410. In Chandler, the Court unequivocally declared that any diversion of public funds to a private purpose would offend the Arkansas Constitution's due process clause, Ark. Const. art. 2, § 8. 236 Ark. at 258.